711 So.2d 1031 (1996)
Thomas Douglas ARTHUR
v.
STATE.
CR-91-718.
Court of Criminal Appeals of Alabama.
March 8, 1996.
Rehearing Denied August 23, 1996.
*1042 Kevin M. Doyle, Montgomery (appearance entered April 16, 1992).
Barry J. Fisher, Atlanta, Georgia (appearance entered April 16, 1992; withdrew May 26, 1995).
Thomas Douglas Arthur, pro se.
Jeff Sessions and Bill Pryor, attys. gen., Andy Poole, Melissa Math, Kenneth Nunnelley, asst. attys. gen., for appellee.
McMILLAN, Judge.
This appeals follows the appellant's third trial for the killing of Troy Wicker. The appellant was convicted of capital murder and sentenced to death by electrocution in each of the three trials. The Alabama Supreme Court reversed the appellant's first conviction, holding that details of the appellant's prior second degree murder conviction were improperly admitted at trial under the *1043 identity exception to the general exclusionary rule. Ex parte Arthur, 472 So.2d 665 (Ala. 1985). The appellant was again convicted of capital murder and was sentenced to death by electrocution. However, this court reversed his second conviction, holding that the admission into evidence a statement made by the appellant to a police officer two weeks after the appellant had asserted his right to remain silent constituted plain error because the appellant did not initiate the conversation and there was no evidence that he had been given access to an attorney following assertion of his right to remain silent. This court held that the statement probably had an unfair prejudicial impact on the jury. Arthur v. State, 575 So.2d 1165 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191 (1991).
Following this second reversal, the appellant was charged in a two-count indictment with the intentional murder of Troy Wicker by shooting him with a pistol, made capital because he had previously been convicted of murder in the second degree in 1977, see § 13A-5-40(a)(13), Code of Alabama 1975, and with capital murder for intentionally causing the death of Troy Wicker by shooting him with a pistol for pecuniary or other valuable consideration, see § 13A-5-40(a)(7), Code of Alabama 1975. Before submitting the case to the jury at the guilt phase, the prosecutor elected to proceed only under the first count of the indictment. The jury found the appellant guilty of capital murder as charged in this first count of the indictment. The jury subsequently returned an advisory verdict of death by electrocution by a vote of 11 to 1. Following a separate sentencing hearing, the trial court upheld the jury's advisory verdict and sentenced the appellant to death by electrocution.
This court set on the earlier appeal out a complete rendition of the evidence presented at the appellant's second trial. Arthur v. State, 575 So.2d at 1167-70. That evidence is substantially similar to that presented in the third trial, but there were some differences: changes in the testimony of State's witness Judy Wicker; the testimony by witness, Gene Moon, was offered on behalf of the appellant at the third trial rather than for the State as in the second trial; and certain evidence that was admitted at the second trial was not entered into evidence at the third trial. For this reason, the trial court's "Findings of Fact From the Trial," which briefly sets out the evidence presented at the third trial, is included[1]:
"State's case:
"Thirteen witnesses testified for the state, the state's case being bottomed on the testimony of accomplice Judy Wicker, Wicker having been indicted and convicted by a jury verdict for the intentional murder of her husband, Troy Wicker.
"Wicker's conviction and life sentence were affirmed in May, 1983 at Mary Jewel Wicker v. State, 433 So.2d 1190. Wicker was in state custody when she testified on Wednesday of the trial week.
"Proceeding Wicker's testimony:
"Eddie Lang, sergeant with Muscle Shoals Police Department, testified about observations of Ms. Wicker's movements on the morning of the killing, February 1, 1982, and his observations of the house where the deceased was murdered;
"Joseph Gary Wallace of the Department of Forensic Sciences, lab director in Florence in 1982, testified about his observations at the scene, the gathering and transfer of physical items from a certain Buick Riviera vehicle;
"Brent Wheeler and John Kilbourne of the Huntsville forensic lab testified about lab procedure;
"Joel Reagan, who ran a mobile home sales lot testified about the defendant's employment at his place of business;
"Talmadge Sterling, correctional officer at the Decatur Work Release Center, testified about defendant's residency at the center as did Pat Halliday, employed at the center, who testified about a discrepancy in the defendant's payroll records;

*1044 "Pat Yarbrough Green, who testified that she became acquainted with defendant at Cher's Lounge (Ms. Green was employed at Cher's Lounge in `parole' status, having suffered several felony convictions); that defendant wanted to talk privately at the lounge; that in the kitchen he asked the witness, `Can you get me some bullets? Has to be .22 caliber mini mag long rifles.' [sic]; that she enlisted the services of a third person to go across the street to buy the bullets; that the defendant gave her $10.00 for the bullets; that while waiting on the delivery of the bullets the defendant stated, `Someone will be killed in Tennessee. Don't worry, it won't be traced to us.' [sic]; also, that defendant asked witness if she had access to `jars' or knockout pills and asked if she knew where defendant could get some jars/pills; that she gave the.22 bullets to the defendant;
"Debra Lynn Phillips Tynes, manager of Cher's Lounge and defendant's paramour, states that on the day of the killing the defendant was late for a lunch date, that ultimately defendant and she went for a car ride across the Tennessee River Bridge; that defendant stopped the car and threw into the river a `plain black garbage bag' wrapped in a sheet, stating that `I want to get rid of some old memories';
"Dr. Pirl, toxicologist, stated that there was no ethanol in the deceased's body nor could he detect any narcotics;
"Dr. Aquilar testified as to cause of death; that deceased was shot at close range through the closed right eye;
"James Otis Garrard, clerk of the circuit court of Marion County testified re[garding] Court Exhibit # 40, court documentation reflective of defendant's prior conviction for second [degree] murder;
"Judy Wicker, who at the time of her testimony in the latest trial resided at a work release center in Wetumpka, serving a life sentence as accomplice to her husband's murder, stated that she lived in Muscle Shoals in 1982 with her husband, their two sons, ages five and seven, and a daughter by a prior marriage; that Troy, her husband, worked on a barge as an engineer; that her marriage(s) to Troy had been marked by intermittent discord; that Troy and her sister, Teresa, did not get along; that Teresa's boyfriend was Theron McKinney; that she met Arthur when they were young and worked with him at Tidwell Homes; that she and Teresa discussed killing Troy in early 1981; that several conversations occurred between she and Teresa re[garding] killing Troy; that there was $90,000 worth of life insurance on Troy's life; that the defendant Arthur called her by phone and stated `I'm hired to do a jobkill your husband'; that about one week after the phone call she and Arthur met at Arthur's father's house or at Reagan's Mobile Homes; that there were sexual encounters between she and Arthur; that she knew the day of February 1 that this was the day her husband was to be killed; that the night preceding the killing she, her husband and Teresa had a drinking party at the Wicker home; that she dropped the children at school on February 1, met ... her sister, finally getting together with Teresa `out by the airport'; that Teresa was driving a Riviera; that defendant was with her, `made up' to look like a black manface blackened, wearing an Afro wig and gloves; that Arthur got out of Teresa's car and into her car; that she smelled alcohol on his breath; that he had a pistol plus a garbage bag; that en route to the Wicker home she asked Arthur not to `do it,' `I'll give you money or whatever'; that Arthur stated `The SOB deserves to die'; that she had left her husband in bed asleep; that upon entering the house defendant began destroying things. We went to the bedroom, I ran but I heard the shot. I ran to the utility room'; further, that she ended up in the den, receiving a blow to the head `battering my head badly, knocking out some teeth, upper lip cut into my nose. I didn't have an upper lip.' [sic]; that previously it had been established that she was to say that her and Troy's home was burglarized and she was assaulted by a black man; the first persons she saw on regaining consciousness were her sister and a detective; that after the killing she and Arthur continued to talk, go places *1045 together; that upon receipt of the insurance money witness paid Arthur $10,000, paid her sister, Teresa, $6,000 and Theron McKinney received some jewelry and a Trans Am automobile.
"Witness Wicker was thoroughly cross-examined by [defense counsel] as to the prior contradictory statements she made to the police and under oath at her trial, as to what she expected to gain from testifying.
"The defense case featured four witnesses:
"Officer Coan, a scene witness;
"Bruce Carrol, an inmate at St. Clair prison who stated he lost $6,500 to the defendant in a poker game;
"Ronald Spears, an inmate at West Jefferson prison who stated that Patsy Yarbrough Green had previously stated to him `The cops told me to lie on Tommy re[garding] the .22 bullets';
"Gene Moon, residing in Cullman County Jail, stated that `Inmate Murry gave me an envelope with $2,000 in it and I put it in Tommy's coat,' thus accounting for the defendant's possession of an inordinate amount of currency at the work release center.
"The defendant did not testify."

I
The appellant argues that the trial court erred in permitting him to act as his own attorney without any inquiry to determine whether the appellant had knowingly and voluntarily waived his right to counsel. The appellant argues that he made no such knowing and voluntary waiver.
The record indicates that the appellant filed a pre-trial motion requesting to act as "co-attorney," with the two attorneys who were representing him. Before the swearing in of the jury, the appellant requested that one of the attorneys assigned to represent him be removed from the case, because he felt that the attorney had been inaccessible and had failed to properly investigate the case. The appellant made this request in the presence of the other attorney, and said that he felt comfortable being represented by that attorney. The trial court placed the objected-to attorney on standby status and ruled that the other attorney could represent the appellant alone. The trial court questioned the remaining attorney as to whether he was comfortable with that relationship and the attorney said he was. The appellant then asked the trial court about his ruling on his motion to act as "co-attorney." The trial court granted the motion. The appellant then asked, "Will it be agreeable with you for me to take an active part in cross-examination or addressing the jury and things of this nature?" The trial court responded affirmatively.
The record indicates that while the appellant took an active roll in cross-examination, formulating objections, and other matters, the attorney representing him also took an active roll in examining witnesses, opening and closing statements, and objections. Thus, the appellant was not solely representing himself, but pursuant to his request of the trial court, was afforded "hybrid representation."
It is well settled that an accused has a constitutional right to self-representation, Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and that that right is applicable in capital murder cases. See e.g., Goode v. Wainwright, 704 F.2d 593, 598 (11th Cir.), reversed on other grounds, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); Smith v. State, 407 So.2d 894 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982). A defendant, however, has no absolute right to hybrid representation, which occurs when a defendant conducts a portion of the trial and counsel conducts the balance. United States v. Turnbull, 888 F.2d 636, 638 (9th Cir.1989), cert. denied, 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990). See also Cross v. United States, 893 F.2d 1287, 1291-92 (11th Cir.), cert. denied, 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990) (the Sixth Amendment does not guarantee a defendant the right to participate as co-counsel.) "`Criminal defendants have no constitutional right to both self-representation and the assistance of counsel. United States v. Halbert, 640 F.2d 1000, 1009 (9th Cir.1981); United States v. Trapnell, 638 F.2d 1016, *1046 1027 (7th Cir.1980).' United States v. Weisz, 718 F.2d 413, 426, n. 72 (D.C.Cir.1983), cert. denied, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984) (emphasis in original)." Ford v. State, 515 So.2d 34, 43 (Ala.Cr.App. 1986), aff'd, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988).
"As the court said in [United States v. Bowdach, 561 F.2d 1160 (5th Cir.1977)]:
"`Faretta [v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] does not hold that a defendant has a Sixth Amendment right to act as co-counsel and we are not willing to extend the reach of the Sixth Amendment to include such a right.
"561 F.2d at 1176 (citation inserted)."
Julius v. Johnson, 755 F.2d 1403, 1403-04 (11th Cir.1985). See also Raulerson v. Wainwright, 732 F.2d 803, 809 (11th Cir. 1984), cert. denied, 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984) ("A defendant may waive his right of self-representation by electing to act as co-counsel. See Brown v. Wainwright, 665 F.2d 607, 611 (5th Cir.1982); Chapman v. United States, 553 F.2d 886, 893, n. 12 (5th Cir.1977).") "[T]he right to appointed counsel and the right to proceed pro se exist in the alternative and the decision to permit a defendant to proceed in hybrid fashion rests in the sound discretion of the trial court. United States v. Daniels, 572 F.2d 535, 540 (5th Cir.1978); United States v. Shea, 508 F.2d 82, 86 (5th Cir.), cert. denied, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975)." United States v. Mills, 704 F.2d 1553, 1557 (11th Cir.1983), cert. denied, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984).
In the present case, the appellant made a motion requesting to act as co-counsel. The trial court was within its discretion in granting the appellant's motion. The appellant, in his third trial for capital murder, was very familiar with the criminal justice system and trial proceedings. He had previously been tried for murder. A review of the record indicates that the appellant knowingly and voluntarily requested to act as co-counsel and very ably represented himself. There was no error by the trial court in allowing him to do so.

II
The appellant argues that the trial court erred in admitting into evidence a number of items of crucial evidence, because, he argues, the prosecutor did not establish the proper foundation for their admission of the items or because they were otherwise inadmissible. The appellant specifically claims as error the admission into evidence of certain hair samples and a wig, which were retrieved pursuant to a search of a 1981 Buick Riviera automobile located in the parking lot of Northwest Alabama State Junior College in Tuscumbia. The appellant also seems to object to the admission into evidence of testimony concerning the automobile itself. The appellant argues that neither the automobile nor the hairs and wig were ever connected to him and that, therefore, they are irrelevant and prejudicial. Additionally, the appellant objects to the admission of evidence concerning the body of the victim, because, he argues, the State failed to prove an adequate chain of custody. The appellant also complains of the admission into evidence of work release records showing the whereabouts of the inmates of the Decatur work release facility from January 31, 1982, through February 1, 1982. The appellant argues that the State failed to lay a predicate for the admission of these records.
The State argues that the appellant failed to object to the admission of any of the evidence and, in fact, the evidence was admitted pursuant to a stipulation by the parties. The listing of the exhibits admitted into evidence by the number and description, contained in the record, is unclear as to the number assigned to specific exhibits. The record does indicate that an extensive hearing was held before the trial court, at which the attorneys for both sides and the appellant were present, during which most exhibits were stipulated to. If no objection was raised to admission of this evidence by the appellant at trial, any error in its admission must rise to the level of plain error. Rule 45, A.R.App.P. Although the appellant indicates that he did object to the admission of the *1047 State's evidence concerning the wig and hair samples and he cites two exhibits he specifically objected to, these exhibits were apparently photographs of the vehicle, rather than the hair and wig evidence. The record indicates that the wig and hair samples were admitted without objection and testimony concerning these exhibits was also introduced without any objection. Although the appellant seems to argue that his objection to two of the photographs of the vehicle should be extended to the wig and hair samples, because that is where that particular evidence was found, his objection to the photographs was general with the exception of one statement by defense counsel that "I doubt if you [the prosecutor] are going to be able to establish the exact location of the defendant's proposed vehicle."
A review of the record indicates that the admission of this evidence did not constitute plain error. The hairs and wig found in the vehicle were clearly relevant, because the State presented evidence through the testimony of Judy Wicker that, when committing the offense, the appellant masqueraded as a black man by wearing a wig and darkening his face. Further, Judy Wicker testified that she drove a 1981 Buick Riviera at the time of the offense and Wicker testified that the appellant entered her car while wearing this wig when she picked him up by the airport. She testified that she drove him in her car to her house, where her husband was still in the bed. He then shot her husband. Thus, this evidence was relevant as supporting and illustrative of the witness's testimony.
The appellant argues that the Decatur work release facility's logs, on which inmates signed in and out of the facility, were improperly admitted into evidence because they were not authenticated. However, the record contains testimony by the shift supervisor at the work release facility that these records were kept in the ordinary course of business and were required by the Department of Corrections in order to monitor the inmates' whereabouts. He testified that it was his responsibility to ensure that the records were maintained on a daily basis.
The appellant argues that these records were not properly authenticated, because this witness was not present at all times corresponding to the times reflected in the record. However, § 12-21-43, Code of Alabama 1975, contains no such requirement.
According to § 12-21-43, Code of Alabama 1975:
"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence and proof of said act, transaction or event if it was made in the regular course of any business and it was the regular course of the business to make such memorandum or record at the time of such act, transaction, occurrence or event, or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility."
Thus, any claim by the appellant that this witness was not present at all times during the period in question would affect the weight rather than admissibility of these records. See also § 12-21-44, Code of Alabama 1975. Alabama case law makes clear that work release records, kept in the ordinary course of business and properly identified by the proper authorities, are admissible into evidence. See, e.g., Frazier v. State, 562 So.2d 543, 549 (Ala.Cr.App.1989), reversed on other grounds, 562 So.2d 560 (Ala.1989).
Moreover, although the appellant attempts to argue that these records should not have been admitted at this third trial because to do so violated his rights to double jeopardy, the appellant has misinterpreted the law established in Hull v. State, 607 So.2d 369 (Ala.Cr.App.1992), and Ex parte Hergott, 588 So.2d 911 (Ala.1991). Those cases held that, where improperly admitted evidence resulted in the State's having failed to prove its case because of insufficient evidence, the State may not thereafter admit additional sufficient evidence in an attempt to properly prove the requisite elements of the offense. The appellant alludes to the language used by this court in Arthur v. State, 575 So.2d 1165, 1186 *1048 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991), reversing the judgment following the appellant's second trial, where this court, in the interest of judicial economy, noted a number of possible procedural problems that transpired during the second trial. The judgment was not reversed on those grounds and the comments were merely instructional. The only comment in that opinion relating to work release records eluded to § 12-21-43 and -44, Code of Alabama 1975, which the State adhered to in the present case.
The appellant argues that the State failed to prove a sufficient chain of custody concerning the body of the victim specifically because no chain of custody concerning the delivery of the body to the Department of Forensic Sciences was presented; however, the evidence clearly establishes that the body was in the same condition and that it had not been tampered with before the examination. There was ample testimony by police officers at the scene of the offense that they observed the wound to the victim's eye. The coroner also testified to this wound when identifying the cause of death.
The record indicates that the appellant did not object when Dr. Aguilar, the coroner, testified about his examination of the body and the cause of death; thus, this claim must be analyzed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
"`Failure to object weighs against a claim of prejudice to the defendant.' The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.' Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Crim.App. 1992); Smith v. State, 583 So.2d 990 (Ala. Crim.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim. App.1990), rev'd, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Crim.App.), appeal after remand, 591 So.2d 149 (Ala. Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984). In Gordon, this court held that because there was no evidence that the victim's body had been tampered with in any way, sufficient chain of custody had been established. Gordon, 587 So.2d at 433.
"`In this case, the record shows testimony was given as to the nature and location of the wounds on the body before the body was removed from the crime scene. [The coroner's] testimony as to the nature and location of the wounds when the autopsy was performed was consistent with [the witness's] earlier testimony. Unlike blood samples, saliva samples, drug seized from a defendant and the like, all of which may be tampered with or even switched with no visible signs that something is different, a body can be identified as the same body that left the crime scene, and that there was not a substitution. Also, only the "remotest possibility" exists that someone would tamper with the body, especially to the extent suggested in this case....'"
Slaton v. State, 680 So.2d 879, 893-94 (Ala. Cr.App.1995).
In the present case, the evidence indicates that the nature, location, and extent of the fatal wound was consistent from the time the body was found at the scene of the offense until the autopsy was conducted. There is no evidence of tampering, and body fluids are not at issue. Therefore, there is no plain error concerning the authentication of the victim's body.

III
The appellant argues that the trial court improperly allowed the State to introduce inadmissible and highly prejudicial hearsay evidence, specifically the testimony of Pat Halliday, a former employee of the Decatur work release center. The specific testimony *1049 to which the appellant refers concerned the witness's review of the work release records which indicated that the number of hours for which the appellant had signed out for work in early 1982 did not accurately match the number of hours that his paycheck records indicated that he had actually worked. Pat Halliday testified that he was a shift supervisor at the Decatur work release center while the appellant was incarcerated there and that it was one of his routine duties to review the logs concerning the number of hours that inmates had checked out of the facility to work and to compare this to the amount of pay being placed on deposit by the inmate. He testified that his review of the appellant's record indicated a discrepancy. The records to which the witness referred were not admitted into evidence, and the witness did not testify as to the specifics of those records, but testified only that his review indicated that there was a discrepancy. He further testified that this discrepancy prompted the Department of Corrections to begin disciplinary actions against the appellant which eventually resulted in the discovery of $2,000 in cash that had been hidden in the appellant's cell.
Although the appellant argues that this testimony was hearsay, the record indicates that the witness testified only as to what he observed and not specifically to what the records contained. The witness's testimony was not introduced to prove that there was in fact a discrepancy or the details thereof, but rather that he detected a discrepancy that led to an investigation by the Department of Corrections. The witness's testimony was that he had observed these facts as part of his routine duties and in turn furnished these facts to the appropriate authorities as part of his routine duties. See Reeves v. King, 534 So.2d 1107 (Ala.1988).
In the course of his argument, the appellant alludes to a purchase order indicating that he had bought a car from his employer. The appellant argues that this purchase order was improperly admitted because, he says, was hearsay and did not fit within the business records exception. However, the record indicates that this purchase order was identified by the appellant's employer as being one of his sale forms following the employer's testimony that the appellant had purchased a car from him. The employer had testified as to the name and nature of his business and the purchase order was thus admissible as a business entry. See e.g., Yarbrough v. Armour & Co., 31 Ala.App. 287, 15 So.2d 281 (1943).

IV
The appellant argues that the prosecutor made a number of improper remarks and that this alleged prosecutorial misconduct entitled him to a reversal of his conviction and sentence. However, a review of the record indicates that the appellant failed to object to any of these remarks; therefore, they must be analyzed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
The appellant argues that the prosecutor's remark that several items of evidence were "undisputed" was a direct comment on his failure to testify. As an example, the appellant cites the prosecutor's statement to the jurors that it was undisputed that the appellant had a car while he was in work release, that he was free to come and go as he pleased, that he was having an affair with Judy Wicker, that he threw a black garbage bag into the river while he was with Debra Phillips, and that he asked Pat Green to purchase .22 caliber bullets for him. However, these remarks merely refer to the fact that the evidence was uncontradicted and do not violate the rule prohibiting comment on a defendant's failure to testify. See Jackson v. State, 414 So.2d 1014 (Ala.Cr.App.1982); Griffin v. State, 393 So.2d 523 (Ala.Cr.App. 1981). See also Hall v. State, 421 So.2d 1334 (Ala.Cr.App.1982).
"The general rule is that statements by the prosecutor to the effect that State's evidence is undenied or uncontroverted are merely indirect references to the defendant's failure to testify and thus do not violate the statute. Swain v. State, 275 Ala. 508, 156 So.2d 368, affirmed on other grounds, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Welch v. State, 263 Ala. 57, 81 So.2d 901; Gore v. State, 45 Ala.App. 131, 226 So.2d 674. Under this rule the *1050 following remarks by prosecuting attorneys have been held permissible notwithstanding the statute: `Gentlemen, do you think we have proved those three elements? I submit to you that it is not denied, there is not a word come from this stand that denied the charge of rape.' Swain, supra. `Mr. Smith criticizes our witness in this case, but Mr. Smith has not given us any witness to criticize.' Broadway v. State, 257 Ala. 414, 60 So.2d 701. `The testimony of the State is uncontradicted and no one has denied it. Gore, supra. `The fact that Mr. Johnson has been robbed was not contradicted.' White v. State, 44 Ala.App. 312, 208 So.2d 222. `The testimony of the state is undisputed. No testimony was presented from the witness stand to contradict any testimony of the State. Williams v. State, 43 Ala.App. 343, 190 So.2d 556. The trial court may allow remarks of this tenor so long as the defendant is not the only witness capable of contradicting the State's proof. If the prosecutor's remarks can be interpreted as referring to the failure of the defense to produce as witnesses existing persons other than the defendant who should be a position to testify in his favor, and who are known to him, then the general rule stated above applies and there no violation of the statute. See Street v. State, 266 Ala. 289, 96 So.2d 686; Broadway, supra; Gore, supra; Padgett v. State, 45 Ala.App. 56, 223 So.2d 597; Williams, supra; Littlefield v. State, 36 Ala.App. 507, 63 So.2d 565; c.f. King v. State, 45 Ala.App. 348, 230 So.2d 538."
Sellers v. State, 48 Ala.App. 178, 187, 263 So.2d 156, 164-65 (1972).
The cited references do not virtually identify the appellant as the only person who could testify concerning the specified evidence. In Smith v. State, 588 So.2d 561 (Ala.Cr.App.1991), this court addressed a situation wherein the prosecutor made commented that he could not perceive of anything that contradicted the State's case or the State's evidence in that case. This court held:
"An examination of the context of the prosecutor's statements clearly indicates that the prosecutor was referring strictly to the uncontradicted nature of the evidence presented and could have, in no way, been commenting on the appellant's failure to testify. `A prosecutor has the latitude to comment on the fact that the State's evidence is uncontradicted or has not been denied. Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975). However, a prosecutor may not make comments that step over the line drawn by the right of a defendant not to testify at trial. Beecher, 294 Ala. at 682, 320 So.2d at 734.' Ex parte Williams, 461 So.2d 852, 853 (Ala. 1984). The Alabama Supreme Court noted in Ex parte Dobard, 435 So.2d 1351, 1359 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984):
'"[W]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, § 6 [Const. of Ala. of 1901] is violated." Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975). Additionally we noted in Beecher:

"`"Where the State's evidence does stand uncontradicted, the prosecutor does have the right to point this out to the jury. In that circumstance the prosecutor could say: `There has been no refutation of any of the evidence presented by the State'; or more simply, `The State's evidence stands uncontradicted,' or other appropriate comment to like effect." Id.

"`We hold that the prosecutor's comments in question could not have been understood as being a reference to the defendant's failure to testify, but rather fall squarely within the approved bounds of Beecher.'
"Similarly, in the present case, as noted by the prosecutor, the State's evidence was uncontradicted. The appellant never denied involvement in the offense; he only raised the question as to the extent of his involvement. The State, through its evidence, acknowledged that there was no way of knowing which participant had committed which acts, but it proved that the *1051 appellant was, in fact, present and involved."
A review of the record and these comments in the proper context makes clear that these comments were strictly an observation by the prosecutor that the State's evidence stands contradicted, and such comment was held permissible in Beecher v. State, supra. They could not have been understood by the jury as having been a reference to the defendant's failure to testify.
The appellant also cites as improper a remark by the prosecutor concerning the evidence as to whether scopolamine, a drug described as "knockout drops," was found in the victim's blood. The appellant argues that the prosecutor commented that the drug was found in the victim's blood and thus clearly indicated that the appellant had administered the drug; therefore, he argues, the prosecutor commented on facts not in evidence. The prosecutor's comment was as follows:
"The blood screen, that's another red herring right there. You had heard from Dr. Pirl that scopolamine had been in this man's blood, or could have been in this man's system or could have been administered to this man. But it wouldn't have shown up because of the
"[Defense counsel]: We object.
"[Prosecutor]: methodology that was used.
"[Defense counsel]: There is no evidence that this man was given scopolamine.
"THE COURT: Overruled. In overruling, I'm not saying that there was. I'm just letting the gentleman comment on the evidence. Of course, you can respond in just a moment."
The record indicates that the State presented evidence that the appellant had inquired about scopolamine, which is apparently referred to as "juars" or "jars," to an acquaintance. He asked her also if she could get some for him, but she testified that she never did. A State's witness, Dr. Pirl, testified that the drug could have been present in the victim's blood; however, he would have been unable to ascertain whether it was because of a number of variables in the testing. The prosecutor's statement was not that the drug was present in the victim's blood, but rather that it could have been. A prosecutor may properly comment on any inferences that can be drawn from the evidence; therefore, the trial court correctly allowed the prosecutor's could comment. The trial court stated in overruling the objection that he was not, in so doing, affirming that scopolamine was present in the victim at the time of the offense. There was no reversible error by this comment.
The appellant also asserts that certain comments made by the prosecutor concerning the appellant's character were improper and highly prejudicial. He refers to a comment by the prosecutor that the appellant had a "big ego" and that he was a manipulator of people. However, these comments by the prosecutor are certainly reasonable inferences from the facts in evidence, including the appellant's relationship with a number of females, his work-related behavior, and his exploitation of the work release program. See Gentry v. State, 689 So.2d 894 (Ala.Cr.App.1994) (the prosecutor's comment that the appellant enjoyed committing the offense was held to be a reasonable inference from the evidence.)
The appellant argues that the prosecutor's comment that there was no evidence that Judy Wicker had a prior murder conviction was an improper comment on his character, because he did have a prior conviction for murder; thus, the appellant claims, the prosecutor was attempting to convince the jury that, because he had a prior murder conviction, he was guilty of the murder in this case. This comment was made by the prosecutor in his rebuttal closing argument. Taken in context, it is clear that the prosecutor was commenting on an argument by the appellant in his closing argument that several parties who were involved in the murder under the State's version of the case were never charged. The prosecutor argued that, although that argument was true because certain accomplices had not been charged, those parties could be prosecuted in the future. The prosecutor further stated that such an argument was not relevant to *1052 the question of whether the appellant was guilty. The prosecutor commented:
"That really has nothing to do with the question of whether or not this defendant is guilty of what he is charged with. It is Tommy Arthur who is on trial here today, not Judy Wicker, not Theron McKinney and not Teresa Roland.
"There is no evidence that Judy Wicker has any prior murder conviction, or really, there is no evidence that she has any kind of
"[Defense counsel]: We object and move to exclude.
"THE COURT: Overruled.
"[Defense counsel]: Exception.
"[THE COURT]: The lady has taken the witness stand. I think her testimony would be a fair comment by both sides."
"[A] prosecutor has the right to `reply in kind' to statements made by defense counsel in the defense's closing argument." Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994). Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995); Ex parte Taylor, 666 So.2d 73 (Ala.1995); Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995). Moreover, the fact that the appellant had previously been convicted of murder is an element of the capital offense for which he was being tried.
The appellant also argues that the prosecutor attempted to introduce evidence of the appellant's alleged bad character by his question to the appellant's former employer as to whether any of his customers had complained of missing money. The appellant argues that, by so asking, the prosecutor sought to allege that the appellant had committed previous thefts. The comment by the prosecutor, taken in context, indicates that the purpose behind the prosecutor's question was to respond to the appellant's defense theory concerning the origin of the $2,000 found in his cell while on work release. At his previous trial and in previous statements the appellant had stated that the $2,000, which was found in an envelope bearing the return address of Reagan Mobile Homes and which was marked as a deposit on a mobile home, was received by him when he was the only employee present on the lot. He had said that he had not had the opportunity to give the money to Mr. Reagan or to the bookkeeper at Reagan Mobile Homes. During the third trial, when the prosecutor was questioning the appellant's former employer, he asked if he recalled when an agent of the Board of Corrections had advised him that the appellant would not be returning. The employer responded that he did not remember the date and the prosecutor then asked: "Okay, let me asked you this: After that date, whenever it was, did you ever receive any complaint of any customers about missing any money?" Defense counsel objected and moved to exclude, which objection and motion were sustained by the trial court.
Thereafter, during the appellant's presentation of his witnesses, his account of the origin of the $2,000 changed. At this trial, a witness who had been an inmate at the same time as the appellant testified that he put the envelope containing the money in the appellant's coat pocket in his cell at the instruction of a third party. The previous version of the appellant's explanation of his possession of this money was not offered at this trial.
Based on the appellant's prior statement and prior trial, the prosecutor did not act in bad faith in asking the appellant's employer this question. Moreover, because the appellant's objection and motion to exclude were sustained by the trial court promptly, before any allegation was made concerning any possible theft, there is no indication that the appellant suffered sufficient prejudice to require a reversal.
"It is clear that'"[a] motion for mistrial should not be granted where the prejudicial qualities of the comment can be eradicated by action of the trial court."` Henry v. State, 468 So.2d 896, 901 (Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985) (quoting Nix v. State, 370 So.2d 1115, 1117 (Ala.Cr.App.), cert. denied, 370 So.2d 1119 (Ala.1979)). Although there are some comments that are so prejudicial that eradication is not possible, see Stain v. State, 273 Ala. 262, 267, 138 So.2d 703, 707 (1961) (in a death case, prejudice caused by unresponsive testimony by a *1053 police officer concerning defendant's shooting of two men in another state was ineradicable); Hines v. State, 384 So.2d 1171, 1182 (Ala.Cr.App.), cert. denied, 384 So.2d 1184 (Ala.1980) (in a rape case where the defense was mental and physical incapacity, prejudice caused by unresponsive testimony by a State rebuttal witness regarding the defendant's sexual capacity was ineradicable), the mother's volunteered comment in this case does not fall within that category. We find that her comment, while clearly uncalled for, is comparable to comments that we have held to be eradicable. See, e.g., Garnett v. State, 555 So.2d 1153, 1155 (Ala.Cr.App.1989) (`any prejudice arising from [prosecutor's] question [indicating that murder defendant had been arrested for beating his wife] ... was both capable of eradication and was eradicated by the trial court's prompt action' in instructing the jurors to disregard the question and in polling the jurors to ascertain that they could disregard the question); Nathan v. State, 436 So.2d 19, 20 (Ala.Cr.App.1983) (in child abuse case, any prejudice arising from comment by prosecutor that another of defendant's children had died was eradicated by trial judge's instruction to jury to disregard); Floyd v. State, 412 So.2d 826, 830 (Ala.Cr.App.1981) (`the trial court's action in immediately instructing the jury to disregard the prosecution's vague reference to another unspecified crime cured any potential error prejudicing the appellant's case'); Garner v. State, 53 Ala.App. 209, 211, 298 So.2d 630, 631, cert. denied, 292 Ala. 721, 298 So.2d 633 (1974) (any prejudicial effect flowing from the prosecutor's question `Did they ever look at the mug shot?' was removed by the trial court's prompt action in instructing the jury to disregard). Where, as in this case, improper remarks are capable of eradication and the `trial court acts promptly to impress upon the jury that improper [remarks] are to be disregarded by them in their deliberations, the prejudicial effects of such remarks are removed.' Woods v. State, 460 So.2d 291, 295 (Ala.Cr. App.1984)."
Register v. State, 640 So.2d 3, 10-11 (Ala.Cr. App.1993).
The appellant was granted all of the relief he sought by the trial court. The trial court acted before the witness answered or made any direct reference or allegation concerning the appellant. The appellant suffered no prejudice.
The appellant's final complaint concerning remarks by the prosecutor addresses a statement made by the prosecutor when reading the indictment during closing argument. The prosecutor stated that the indictment had been signed by him in his capacity as district attorney; the appellant argues that this statement constituted an improper insertion of the prosecutor's credibility and was an attempt to bolster the possibility of conviction.
In Kuenzel v. State, 577 So.2d 474, 491 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197, (1991), the prosecutor commented, during his closing argument to the jury, on the fact that he was said to "frown too much" and to appear "too miserable." He then stated that "quite frankly, in the eleven years that I have been in this job, day after day, week after week, and month after month, there is not anything funny once you come inside this rail." In holding that this comment did not constitute plain error, despite the fact that prosecutors should not comment on matters not supported by the evidence, this court held that the comment was not an effort to "`cajole [the jury] into reaching a verdict based on the credibility or importance of the state's representative,'" as the appellant in that case alleged.
"Similarly, in Smith v. State, 588 So.2d 561, 569 (Ala.Cr.App.1991), the appellant argued that the prosecutor and the assistant prosecutor had emphasized their roles as representatives of the State in their opening remarks to the jury. The appellant noted that the prosecutors had referred to the fact that they represented the State. This court found no error in the prosecutors' comment, citing Gallant v. State, 167 Ala. 60, 63, 52 So. 739, 741 (1910), wherein the Alabama Supreme Court held that a prosecutor's statement during closing argument explaining his *1054 duty as a prosecutor and his relation as such to organized society was not error. Thus, the prosecutor's comment in the present case did not constitute plain error."
Gaddy v. State, 698 So.2d 1100, 1127 (Ala.Cr. App.1995).
Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.

V
The appellant argues that Judy Wicker was incompetent to testify against him, because she had admitted to perjury in a previous proceeding. Judy Wicker was questioned in the present case about her previous trial testimony and was cross-examined extensively concerning the discrepancies between her prior testimony and the testimony in the present case. The appellant further argues that it is both arbitrary and unconstitutional to limit the application of § 12-21-162, Code of Alabama 1975, to only those persons convicted of perjury or subornation of perjury as to incompetency.
Section 12-21-162, Code of Alabama 1975 provides:
"(a) No objection must be allowed to the competency of a witness because of his conviction for any crime, except perjury or subornation of perjury."
It is clear under Alabama law that criminal acts which terminate in less than a conviction are inadmissible. Daniels v. State, 375 So.2d 523 (Ala.Cr.App.1979). There is no proof or even an allegation that Judy Wicker had been tried for or convicted of perjury or subornation of perjury. Judy Wicker's admission to having given false testimony could not render her incompetent as a witness pursuant to § 12-21-162, Code of Alabama 1975. The appellant was allowed to and, in fact, did bring before the jury the previous false testimony given by this witness. These discrepancies then became matters to be considered by the jury in determining the weight to be afforded to this witness's testimony. They did not, however, affect her competency as a witness. Moreover, the limitation in § 12-21-162 is reasonable and proper because all legal rights afforded any individual must have been met prior to denying an individual of his or her right to testify.

VI
The appellant argues that the trial court's oral charge to the jury during the guilt phrase of this trial was improper and unconstitutional. The record indicates that the appellant failed to object during trial to any alleged errors in the charge; therefore, this claim must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.

A.
Initially, the appellant argues that the trial court erred in its jury instructions concerning corroborating evidence, especially because, he says, the evidence was not sufficient to corroborate the testimony of an accomplice, Judy Wicker. The appellant argues that the trial court erred on this ground in two respects: that it charged the jury that suspicious behavior by the appellant could constitute sufficient corroboration, and because he failed to charge the jury that Pat Green, who purchased bullets for the appellant and gave them to him, was also an accomplice so that her testimony could not be used as corroboration.
The record indicates that the trial court instructed the jury concerning accomplice testimony and corroboration, after acknowledging that Judy Wicker was a self-confessed accomplice to the killing, as follows:
"We have a special statute relative to accomplice testimony, and I would like to go over it with you. A convictionthe statute styled accomplice testimony for a felony conviction, conviction of a felony can not be had on the testimony of an accomplice unless corroborated by other evidence pending [sic] to connect the defendant *1055 taking about Arthur herewith the commission of the events.
"In such corroborative evidence, if it merely shows the commission of the offense, or circumstances thereof, its not sufficient. Now, you people decide as the jurors and trier of the facts, if sufficient corroborative evidence has been presented to you that makes more certain or confirms or strengthens the incriminating force of Ms. Wicker's testimony, as it relates to Arthur.
"Now, our case law says this: The corroborative evidence need not be strong or sufficient in itself to support a conviction. The requirement is that it legitimately connects Defendant Arthur, I'll use the names to make it a little more personal, with the offense.
"Sufficient corroboration of testimony of an accomplice may be furnished by the defendant'stalking about Mr. Arthur suspicious conduct, if you find that his conduct was suspicious, by the association of the accused, Mr. Arthur, with the accomplice, Judy Wicker, by the defendant's proximity and opportunity to commit the crime.
"And, of course, by a non-accomplice witness' testimony that tends to connect Defendant Arthur with the events, both circumstantial and direct evidence or competent to connect a defendant independently with the crime about which the accomplice has testified."
The appellant argues that the instruction by the trial court, concerning the sufficiency of evidence of suspicious conduct by the appellant, his association with the accomplice, and his proximity to and opportunity to commit the crime as sufficient corroboration, was erroneous. The appellant supports his argument by citing Lindhorst v. State, 346 So.2d 11 (Ala.Cr.App.), cert. denied, 346 So.2d 18 (Ala.1977), the proposition that suspicious conduct alone is insufficient corroboration of accomplice testimony. In Lindhorst, supra, at 16, the court wrote:
"Suspicious conduct alone is insufficient corroboration. There must be something more. Suspicious conduct coupled with close proximity to the crime and opportunity to commit it has been held to be sufficient. Cheatwood v. State, 22 Ala.App. 165, 113 So. 482 (1927)."
In Lindhorst, this court found, excluding the accomplice's testimony:
"1. No evidence of motive.
"2. No evidence that appellant was in possession of any fruits of the crime.
"3. No physical evidence at the scene of the crime to connect the appellant, such as fingerprints on the Cadillac or in the house.
"4. No murder weapon was in evidence.
"5. Appellant was not seen in the company of the accomplices at unusual times and at unreasonable hours, at or near the scenes of the crimes; in fact, he was not seen in Huntsville at all by any non-accomplice witnesses.
"6. There was no evidence of a prior threat on appellant's part.
"7. There is no actual evidence of flight on the part of the appellant."
Id. at 17.
Under the facts in Lindhorst, supra, evidence of the appellant's suspicious behavior was the only corroborative evidence introduced at trial; there was no further evidence presented tending to connect the appellant with the commission of the offense. However, the suspicious behavior of the appellant may be considered as corroborative evidence if the State presents sufficient evidence that tends to connect the appellant with the offense. This must be determined on a case by case basis. "An accused's entire conduct may be examined for corroborating circumstances. Peoples v. State, [418 So.2d 935, 939 (Ala.Cr.App.1982)]." Hodges v. State, 500 So.2d 1273, 1276 (Ala.Cr.App. 1986). "`An accused's consciousness of guilt as shown by the evidence may be corroborative.' Jacks v. State, 364 So.2d 397, 405 (Ala.Cr.App.), cert. denied, 364 So.2d 406 (Ala.1978)." Craig v. State, 493 So.2d 406, 408 (Ala.Cr.App.), cert. denied, 493 So.2d 409 (Ala.1986). See also Ware v. State, 409 So.2d 886, 891 (Ala.Cr.App.1981), writ quashed, 409 So.2d 893 (Ala.1982).

*1056 "Additionally, sufficient corroboration of the testimony of an accomplice may be furnished by a tacit admission by the accused, by the suspicious conduct of the accused, and the association of the accused with the accomplice, or by the defendant's proximity and opportunity to commit the crime. Cheatwood v. State, 22 Ala.App. 165, 113 So. 482, cert. denied, 216 Ala. 692, 113 So. 915 (1927); 23 C.J.S. Criminal Law § 812(4).
"`In determining the sufficiency of the corroborative evidence testimony, the entire conduct of an accused within reasonable time limits of the date of the offense may be examined.' Fuller v. State, 34 Ala.App. 211, 215, 39 So.2d 24, 27, 252 Ala. 20, 39 So.2d 29 (1949). An accused's consciousness of guilt as shown by the evidence may be corroborative. Fuller, 34 Ala.App. 215, 39 So.2d 24."
Jacks v. State, 364 So.2d 397, 405 (Ala.Cr. App.), writ denied, 364 So.2d 406 (Ala.1978).
"The fact that at or about the time of the commission of an offense with which an accused is charged, he and the accomplice were together, in or near the place where the crime was committed, may in conjunction with other facts and circumstances sufficiently tend to connect the accused with the commission of the crime to furnish the necessary corroboration of the accomplice. Lindhorst, supra, and cases cited therein."
Keller v. State, 380 So.2d 926, 936 (Ala.Cr. App.1979), writ denied, 380 So.2d 938 (Ala. 1980).
Before determining whether there was sufficient corroborating evidence in the present case, the appellant's second argument, that State's witness Patricia Green was also an accomplice and that the trial court's failure to so charge, must be determined. It should be noted that the appellant did not request such a charge or object to the trial court's failure to give one. The record indicates that Patricia Green, who testified that she had previously been convicted of several felonies, stated, that at the time of the offense, she was working at a "Go-Go" club called Cher's Lounge. She testified that she had known the appellant since 1982 when she had been in the Madison County jail's work release program. She testified that the appellant came into Cher's Lounge on a regular basis and that he was in the lounge on January 31, 1982, at some time between 2:00 p.m. and 4:30 p.m. She testified that the appellant stated that he wanted to talk to her, so they went into the kitchen. The appellant then asked her to get him some .22 caliber mini magnum long rifle bullets. Patricia Green testified that she told the appellant that she could not; she said that she sent someone from the lounge across the street to get her roommate. When her roommate arrived at the lounge, Patricia Green gave him a note instructing him to purchase the bullets and gave him $10, which the appellant had given to her. She testified that the roommate was gone for approximately 30 to 40 minutes, during which time the appellant told Patricia Green that the bullets would be used to kill someone in Tennessee, but that she should not worry because the bullets would not be traced back to them. She testified that the appellant did not indicate who the victim was to be. Thereafter, Patricia Green's roommate returned with the bullets and Green gave them to the appellant.
"Section 13-9-1, Code of Alabama 1975 (formerly Title 14, § 14), states:
"`The distinction between an accessory before the fact and a principal, between principals in the first and second degrees, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, though not present, must hereafter be indicted tried and punished as principals, as in the case of misdemeanors.' (Emphasis added.)
"The accomplice statute has been applied to all felonies, both capital and non-capital in the past. It has been applied to charge an accomplice as a principal likewise in cases where specific intent to commit a crime must be charged on the part of the principal. In order to convict an accomplice of a traditional murder charge pursuant to that statute, it has been necessary to show that the accomplice had a *1057 previous understanding to kill or injure the deceased, or had a knowledge of the intent to kill on the part of the co-defendant. In Jordan v. State, 81 Ala. 20, 1 So. 577 (1886), our Supreme Court stated:
"`... When a particular intent or formed design is requisite to constitute an offense, knowledge of its existence and a common purpose to perpetrate the offense must be shown before a person can be convicted of aiding and abetting. We so held on the former appeal. Jordan v. State, 79 Ala. 9; State v. Hildreth, 51 Amer.Dec. 369, and notes.'
In Tanner v. State, 92 Ala. 1, 9 So. 613 (1890), the court stated:
"`... The accomplice, as we have seen, is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy formed. He is not responsible for any special act, not within the scope of the common purpose, but grows out of the individual malice of the perpetrator. 1 Wharton Crim.Law, § 397.
"It is the opinion of this court that the accomplice statute brings an aider and abettor within the purview of the capital felony statute."
Keller v. State, 380 So.2d 926, 934-35 (Ala.Cr. App.1979), writ denied, 380 So.2d 938 (Ala. 1980).
In Watkins v. State, 495 So.2d 92 (Ala.Cr.App.1986), this court held that the jury could reasonably have found that a defendant was properly convicted as an accomplice to capital murder in that he aided the triggerman in the shooting and helped facilitate the murder. Concerning the role of an accomplice in a capital offense, this court stated:
"According to the complicity statute, § 13A-2-23, Code of Alabama 1975:
"`A person is legally accountable for the behavior of another constituting a criminal offense if, with intent to promote or assist the commission of the offense:
"`(1) He procures, induces or causes such other person to commit the offense;
"`(2) He aids or abets such other person in committing the offense....'
"In Gwin v. State, 456 So.2d 845, 851 (Ala.Cr.App.1984), we stated:
"`"Aid and abet `comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.'" Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raidford [Raiford] v. State, 59 Ala. 106, 108 (1877). "The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence." Miller v. State, 405 So.2d 41, 46 (Ala.Cr.App.1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App.1977), cert. denied, 357 So.2d 161 (Ala.1978).' (Emphasis in original.)
"Furthermore, in Sanders v. State, 423 So.2d 348, 351 (Ala.Cr.App.1982), it was stated:
"`Community of purpose may be formed in a flash, and participation and community of purpose may be shown by circumstantial evidence or inferred from the conduct of the participants. Smith v. State, 57 Ala.App. 151, 326 So.2d 686 [680] (1976). Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred. Smith, supra.'
"In considering accomplice liability for a capital offense, we must look beyond the general principles, to the following:
"`"[N]o defendant is guilty of a capital offense unless he had an intent to *1058 kill, and that intent to kill cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 645, 662 (Ala., March 6, 1981)"; Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala.Law 456, 468 (1981). See also Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App.1982), holding that Enmund is inapplicable to a defendant who does not receive the death penalty. However, a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself. Ritter v. State, 375 So.2d 270 (Ala.1979). "[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony." Ex parte Raines, 429 So.2d 1111, 1112 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).
"`....
"`Our duty on appeal was stated in Raines, 429 So.2d at 1113. "To affirm a finding of a `particularized intent to kill,' the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.'"
"Lewis v. State, 456 So.2d 413, 416-17 (Ala.Cr.App.1984)."
495 So.2d at 102-03.
In the present case, Patricia Green testified that she arranged the purchase of the bullets for the appellant and, after being informed by him that they were to be used to kill a man in Tennessee, she gave them to him. She further acknowledged her participation, stating that she was assured that the bullets would not be traced back to them. Thus, a jury may have reasonably found that Patricia Green was an accomplice to the capital murder.
However, even assuming that Patricia Green was an accomplice, the trial court's failure to so charge the jury may not constitute plain error and, in fact, may be harmless error under the facts of this case. In Gurley v. State, 639 So.2d 557, 561 (Ala.Cr.App. 1993), the appellant alleged that plain error was committed by the trial court in failing to instruct the jury that the testimony of two witnesses, who the appellant alleged were accomplices, must be corroborated. This court wrote:
"For purposes of this argument, we assume that whether [the alleged accomplices] were accomplices was a question of fact for the jury to determine. We also assume that the trial judge should have charged the jury that, if it determined that [the alleged accomplices] were accomplices, then in order to convict the appellant it must find that the accomplice testimony had been corroborated by other evidence tending to connect the appellant with the charged offense. Ala.Code 1975, § 12-21-222.
"However, the error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of the accomplice has in fact been corroborated. Frazier v. State, 562 So.2d 543, 558 (Ala.Cr.App.), reversed on other grounds, 562 So.2d 560 (Ala.1989). Accord People v. Brunner, 797 P.2d 788, 790 (Colo.App. 1990); State v. Brown, 187 Conn. 602, 447 A.2d 734, 740 (1982); Ali v. United States, 581 A.2d 368, 377-78 (D.C.App.1990), cert. denied, 502 U.S. 893, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991); Strong v. State, 261 Md. 371, 275 A.2d 491, 495 (1971), vacated on other grounds, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972); State v. England, 409 N.W.2d 262, 265 (Minn.App. 1987)."
639 So.2d at 561.
In Burton v. State, 651 So.2d 641, 653-54 (Ala.Cr.App.1993), affirmed, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), the appellant argued that two State's witnesses were accomplices and that, therefore, their testimony had to be corroborated. This court found that one of the witnesses was not an accomplice because she was not "an associate in crime; a partner or partaker in guilt," but *1059 addressed the participation of the other alleged accomplice as follows:
"McCants, however, freely admitted to participating in the crime and was clearly an accomplice to the robbery-murder. The court should have instructed the jury concerning the need for corroborative evidence of McCants's testimony. However, the failure to do so does not mean that this cause must automatically be reversed. Automatic reversal exists only when the error `necessarily render[s] a trial fundamentally unfair.' Rose v. Clark, 478 U.S. 570, [577] 3105, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). Alabama has applied the harmless error analysis in a case involving the death penalty to the failure of the court to instruct the jury on the principle of accomplice corroboration. Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993); Frazier v. State, 562 So.2d 543, 558 (Ala. Cr.App.), rev'd on other grounds, 562 So.2d 560 (Ala.1989).
"As Judge Bowen stated in Gurley:

"`[T]he error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of an accomplice has in fact been corroborated. Frazier v. State, 562 So.2d 543, 558 (Ala.Cr.App.), reversed on other grounds, 562 So.2d 560 (Ala.1989). Accord People v. Brunner, 797 P.2d 788, 790 (Colo.App.1990); State v. Brown [187 Conn. 602], 447 A.2d 734, 740 (Conn.1982); Ali v. United States, 581 A.2d 368, 377-78 (D.C.App.1990), cert. denied, 502 U.S. 893, 112 S.Ct. 259 [116 L.Ed.2d 213] (1991); Strong v. State 261 Md. 371], 275 A.2d 491, 495 (Md.1971), vacated on other grounds, 408 U.S. 939 [92 S.Ct. 2872, 33 L.Ed.2d 760] (1972); State v. England, 409 N.W.2d 262, 265 (Minn.App.1987)."
651 So.2d at 635-54. See also Frazier v. State, 562 So.2d 543, 558 (Ala.Cr.App.1989), reversed on other grounds, 562 So.2d 560 (Ala.1989).
In order to determine whether there was sufficient corroboration in this case, as well as to determine whether the trial court's failure to charge the jury that there was a question as to whether Patricia Green was also an accomplice, was harmless error, we must examine the record as to what of the State's evidence remains after the testimony of Judy Wicker and Patricia Green is eliminated. "An accomplice's testimony must be supported by evidence connecting the defendant with the commission of the offense rather than merely showing that the offense occurred or the circumstances thereof. Code of Alabama 1975, § 12-21-222; Miles v. State, 476 So.2d 1228 (Ala.Cr. App.1985); Jackson v. State, 451 So.2d 435 (Ala.Cr.App.1984)." Hodges v. State, 500 So.2d 1273, 1275 (Ala.Cr.App.1986).
"`Corroboration need only be slight to suffice.' Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App.1981). `While corroborating evidence need not be strong, it "... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt." McCoy v. State, 397 So.2d 577 (Ala.Crim.App.), cert. denied, 397 So.2d 589 (Ala.1981).' Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr.App.1985). `However, the corroboration need not be sufficiently strong by itself to warrant a conviction.' Miles v. State, 476 So.2d 1228, 1234 (Ala. Cr.App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App. 1981). `The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense.' Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App.1984). `Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury.' Caldwell v. State, supra, at 170. Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App. 1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983)."
Hodges v. State, 500 So.2d at 1275-76.
In Ware v. State, 409 So.2d 886 (Ala.Cr. App.1981), writ quashed, 409 So.2d 893 (Ala. *1060 1982), this court quoted Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979), stating:
"`The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. "Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony." Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala. App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935) ("(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of `tending to connect the defendant with the commission of the offense,' need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant"); 23 C.J.S. Criminal Law § 812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739 (1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930).
"`In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Ross v. State, 74 Ala. 532 (1883); DeGraaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948).' 370 So.2d at 322."
409 So.2d at 891.
Thus, to constitute sufficient corroboration, a fact or circumstance may tend to support the accomplice's version, thereby confirming his credibility, but in order to provide sufficient corroboration of accomplice testimony, the evidence must connect the accused with the commission of the offense. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr. App.1984). Thus, in Senn v. State, 344 So.2d 192 (Ala.1977), the Alabama Supreme Court held as insufficient corroborating evidence that merely confirmed the commission of the offense, without connecting the defendant thereto, and the only evidence concerning the appellant was that he had been seen at an accomplice's house on the night before the offense, and had been seen with the accomplice by the victim of the larceny on the day before the offense, driving quickly down a road near the stolen property.
However, in the present case, the State presented the following corroborating evidence, after eliminating the testimonies of Patricia Green and Judy Wicker: (1) The appellant's employer at the time of the offense testified that he had met Judy Wicker several times when she was with the appellant on the job site; (2) The appellant's former employer also testified that the appellant paid $2,000 cash for a car on January 21, 1982; the date according to a sales slip. (3) The work release center logs verified that the appellant was checked out of the work release center at the time of the offense. (4) An employee of the work release center testified that in March a discrepancy was found in the amount of money that the appellant had on account and the amount of money he should have had according to his payroll hours. This particular factor corroborates Judy Wicker's testimony that the appellant contacted her several times asking for the *1061 money, before she paid him $10,000 from the victim's insurance proceeds. Moreover, following an inventory search, 20 $100 bills were found in an overcoat in the appellant's cell; (5) State's witness Phillips testified that on the day of the offense the appellant was late for their date. Moreover, the appellant changed their original plans to go to lunch and instead drove to a bridge over the Tennessee River, stopped, turned around as if to head home, but returned and parked midway over the bridge. He then threw a garbage bag wrapped in a sheet off the bridge, stating that he was "trying to get rid of some old memories"; and (6) Negroid-type hairs were found in Wicker's vehicle. However, this factor corroborates the version of the offense offered by Judy Wicker, the accomplice, but does not connect the appellant to the offense.
Although this evidence alone is not sufficient to support the appellant's conviction, it is sufficient to corroborate the accomplice or accomplices' testimonies. The appellant's unexplained and improper[2] possession of large amounts of cash following the offense corroborated Judy Wicker's statement and connected the appellant to the offense. Moreover, the appellant's actions and behavior just after the offense, as testified to by State's witness Phillips, also may be considered as corroborative evidence. Moreover, this evidence showed that the appellant had the motive for and the opportunity to commit the murder. Jacks v. State, supra, at 405. Thus, there was no plain error on this ground.

B.
The appellant argues that the trial court "constructively amended" the indictment by charging the jury that the State had to prove that the victim was shot, without specifying that that State had to prove that he was shot with a pistol as charged in the indictment. However, the record indicates that after the trial court's jury charge at the guilt phase, the following transpired:
"[Defense counsel]: The defendant does have an exception wherein the Court read from the indictment that the deceased was killed by a .22 caliber. The word in the indictment is `pistol.' We feel like the words of the indictment should have been stated to the jury rather than the caliber of the pistol.
"THE COURT: All right, sir. I think you're probably right. Since you have this back there, folks, I'll highlight for you again that [defense counsel] is right. Mr. Arthur is charged with intentionally causing the death of Troy Wicker by shooting him with a pistol. And that is a correct statement that the gentleman made. So I will correct myself, and I appreciate your calling that to my attention."
Thus, the record indicates that the jury was properly instructed by the trial court that the appellant was charged with intentionally killing the victim with a pistol, as stated in the indictment. The appellant suffered no prejudice on this ground.

C.
The appellant argues that the trial court erred in failing to instruct the jury on the lesser included offense of conspiracy to commit murder. § 13A-4-3, Code of Alabama 1975. Because the appellant failed to request this charge at trial and made no objection to the trial court's failure to do so, this matter must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P. The record indicates that the jury was charged as to the lesser included offenses of murder and manslaughter.
The record indicates that there was no reasonable theory from the evidence to support a conviction of guilt on the charge of conspiracy to commit murder. The State's evidence indicated that the appellant was guilty of capital murder. The appellant presented testimony to discredit the State's witnesses and to indicate that he was being framed for an offense he did not commit. The appellant presented no evidence to indicate that he was guilty of conspiracy to commit murder. During his closing argument to *1062 the jury, the appellant argued that he was not guilty of the charged offense.
In Mullis v. State, 545 So.2d 205, 211 (Ala.Cr.App.1989), this court stated:
"The appellant's fourth contention is that the trial court committed reversible error in failing to charge the jury on the lesser included offense of conspiracy to murder. We disagree. The homicide was committed.
"The jury, from the evidence presented could arrive at only one or two conclusions. The appellant was either guilty of the capital offense as charged or was not guilty.... The jury had the option of believing the State's witnesses or believing the appellant's version and acquitting him.
"....
"A court may refuse to charge on a lesser included offense `when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser included offense.' Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978); Greer v. State, 475 So.2d 885, 890 (Ala.Cr.App.1985); Wesley v. State, 424 So.2d 648 (Ala.Cr.App.1982).
"In McKeithen v. State, 480 So.2d 36, 37 (Ala.Cr.App.1985), we held:
"`[W]here the accused denies committing any offense, if any reasonable interpretation of the evidence will justify a verdict finding the accused guilty of the lesser included offense, the jury must be so instructed. Ex parte Stork, 475 So.2d 623 (Ala.1985). A judge may properly refuse to charge on lesser included offenses only where the only reasonable conclusion from the evidence is that the accused is guilty of the offense charged or no crime at all or where the requested charge would have a tendency to mislead or confuse the jury.'
"`....
"Recently, in Moton v. State, 524 So.2d 381, 383 (Ala.Cr.App.1988), we held that a trial court correctly refused to charge on a lesser included offense where the only reasonable conclusion from the evidence was that the accused was either guilty of the offense charged or of no crime at all."
545 So.2d at 211.
Thus, pursuant to the evidence presented at trial, there is no plain error in the failure of the trial court to charge the jury on the lesser included offense of conspiracy to commit murder.

D.
The appellant argues that the trial court's instructions on reasonable doubt and the presumption of innocence impermissibly "diluted" the State's burden of proof. The appellant bases his argument on Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The language he specifically complains of, which was used by the trial court in giving its charge to the jury on the reasonable doubt standard, was "proved to a moral certainty," "proof beyond a doubt for which a good, sound, sensible person could give a reason," and "an abiding conviction that Mr. Arthur here is guilty." The appellant states that there was other language used by the trial court during this instruction that impermissibly diminished the State's burden of proof.
However, a review of the trial court's instruction on the reasonable doubt standard to the jury reveals the absence of any of the language found objectionable in Cage v. Louisiana, supra.
"`In Cage v. Louisiana, [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)], the United States Supreme Court found that if the instruction equated "reasonable doubt" to "grave uncertainty" and "actual substantial doubt" and stated that what was required was "moral certainty" a reasonable jury could interpret the instruction to allow a lesser degree of proof to convict than that required by the Due Process Clause. It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage. Gaskins v. McKellar, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).'
"Sockwell v. State, 675 So.2d 4, 23 (Ala.Cr. App.1993). However, where some of the terminology found offensive in Cage v. Louisiana, supra, is used in a reasonable *1063 doubt instruction, reversible error does not automatically result. Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), reversed in part and remanded on other grounds, 659 So.2d 122 (Ala.1992); Smith v. State, 588 So.2d 561, 562 (Ala.Cr.App.1991); Williams v. State, 601 So.2d 1062 (Ala.Cr. App.1991), affirmed without opinion, 662 So.2d 929.
"Following the decision in Cage v. Louisiana, supra, the United States Supreme Court re-examined the propriety of a jury instruction concerning the reasonable doubt standard in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
"`In Victor v. Nebraska, the Supreme Court accepted ... [the] premise that "moral certainty," standing alone, might not be recognized by modern jurors as a synonym for "proof beyond a reasonable doubt."' 511 U.S. at 14, 114 S.Ct. at 1247. However, the Court determined that when the phrase "moral certainty" was used in conjunction with the other language explanatory of the standard of proof required to convict, it was not unconstitutional.
"`The moral certainty language cannot be sequestered from its surroundings. In the Cage [v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)], instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury ... was told that a reasonable doubt is "that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case.'"
"`Victor v. Nebraska, 511 U.S. at 16, 114 S.Ct. at 1248 (emphasis in original) (citation omitted).'"
Gaddy v. State, 698 So.2d at 1138-39.
In the present case, the instructions given by the trial court to the jury concerning the reasonable doubt standard were proper. See also Slaton v. State, 680 So.2d 879 (Ala.Cr. App.1995).

VII
The appellant argues that the use of his 1977 murder conviction as an element of an offense defined by a statute enacted in 1981 violates the constitutional prohibition against ex post facto laws.
However, in Hubbard v. State, 500 So.2d 1204, 1215 (Ala.Cr.App.), affirmed, 500 So.2d 1231 (Ala.1986), the defendant alleged that the use of his prior conviction as an element of capital murder violated his rights to due process and constituted double jeopardy. This court stated:
"We also find no merit in appellant's claim that the use of the prior conviction as an element of the statutory capital offense and its use in sentencing constituted double jeopardy. Such statutes and other enhanced-sentence laws, including recidivist statutes, have been sustained on many occasions against contentions that they violate constitutional strictures dealing with double jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and privileges and amenities. See, e.g., Gryger v. Burke, 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); Arthur v. State, supra; Hubbard v. State, supra; Wilson v. State, supra."
Id. at 1215.
Moreover, the appellant raised a similar claim in a prior appeal, and that claim was decided adversely to him. The Alabama Supreme Court stated:
"The defendant has raised several issues regarding the fact that the indictment in the present case included a charge that he had been previously convicted of murder in the second degree. Among his contentions is the assertion that the inclusion in the indictment of the prior conviction deprived him of his due process rights. However, it is clear that the prior conviction, which is the aggravating circumstance under *1064 § 13A-5-40(a)(13), must be alleged in the indictment in order to afford the defendant due process:
"`In Alabama, by statute, the aggravating circumstance must be alleged in the indictment where the death penalty is sought.... The aggravating circumstances must be set forth in the indictment because the state is required to give the accused notice that a greater penalty is sought to be inflicted than a first offense. It is fundamental that the accused must be advised and informed of the nature and extent of the offense with which he is charged.
"`Under the Death Penalty Statute, the aggravating circumstance is a statutory element of the crime. Without it, one could not be charged and convicted for "capital murder." ...' (Citations omitted.)
"Wilson v. State, 371 So.2d 932, 940 (Ala. Crim.App.1978), aff'd, 371 So.2d 943 (Ala. 1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1133 (1980), rev'd on other grounds, 405 So.2d 696 (Ala.1981) (quoted in Hubbard v. State, 382 So.2d 577, 590 (Ala.Crim.App.1979), aff'd, 382 So.2d 597 (1980), rev'd on other grounds, 405 So.2d 695 (Ala.1981)) (both cases involving convictions under § 13-11-2(a)(13) which was the forerunner of the present § 13A-5-40(a)(13)).
"The defendant's other arguments concerning the inclusion of the prior conviction in the indictment are also without merit and need no discussion."
Ex parte Arthur, 472 So.2d 665, 667 (Ala. 1985).
We find no merit to the appellant's argument that the capital offense with which he was charged violated the ex post facto laws under the United States Constitution.

VIII
The appellant argues that one of the State's witnesses, Brent Wheeler, should not have been allowed to testify about the bullet and firearm that killed the victim, because, he says, the prosecution failed to sufficiently demonstrate that he was qualified as an expert in this area. A review of the record indicates that the appellant failed to object on this ground at trial and, therefore, this argument must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The appellant's specific contention is that Brent Wheeler was not sufficiently qualified as a ballistics expert because the State proved only that he had a Masters of Science degree and unspecified "on the job" training.
"The admissibility of expert opinions is authorized in this state by § 12-21-160, which reads: `The opinions of an expert on any questions of science, skill, trade, or like questions are always admissible; and such opinions may be given on the facts as proved by other witnesses.' The criterion for admission of expert testimony is that the witness, by study, practice, experience, or observation as to a particular subject should have acquired knowledge beyond that of an ordinary witness; an expert witness is one who can enlighten the jury more than the average man on the street, one whose knowledge extends or supersedes that of an ordinary witness, or one who is shown, either by training or experience, to be better informed than a hypothetical average jury. Charles v. State, 350 So.2d 730 (Ala.Cr.App.1977); C. Gamble, McElroy's Alabama Evidence § 127.01(5) (3d ed. 1977). Whether a witness is sufficiently qualified to testify as an expert is a question for the trial court in its discretion to resolve, and its ruling will not be disturbed on appeal unless there has been abuse of that discretion. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), writ quashed, 378 So.2d 1173 (Ala.1979); Radney v. State, 342 So.2d 942 (Ala.Cr. App.1976), cert. denied, 342 So.2d 947 (Ala. 1977); C. Gamble, supra, at 127.01(5)."
Bailey v. State, 574 So.2d 1001, 1003 (Ala.Cr. App.1990). See also Bird v. State, 594 So.2d 644, 648 (Ala.Cr.App.1990), reversed on other grounds, 594 So.2d 676 (Ala.1991).
"Furthermore, any objection to an expert witness on the ground that he or she lacks knowledge goes to the weight rather than to the admissibility of his or her testimony. Johnson v. State, 378 So.2d 1164 (Ala.Cr. *1065 App.), cert. quashed, 378 So.2d 1173 (Ala. 1979).
"`"Whether the qualification of the witness is sufficient is a question to be determined by the trial court, and the very nature of the test requires that its determination in particular cases be left to the sound discretion of the trial court,... which will not be revised on appeal, except for palpable abuse." Jones v. State, 181 Ala. 63, 80, 61 So. 434 (1913); C. Gamble, McElroy's Alabama Evidence Section 127.01(5) (3d ed. 1977).'
"Bailey v. State, 421 So.2d 1364, 1368 (Ala. Cr.App.1982). See also Varner v. State, 420 So.2d 841 (Ala.Cr.App.1982); Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173 (Ala.1979)."
Smoot v. State, 520 So.2d 182, 189 (Ala.Cr. App.1987).
In the present case, Brent Wheeler testified that he was employed by the Alabama Department of Forensic Sciences and had been so employed for approximately 20 years at the time of the trial. Moreover, he testified that he was director of the lab and that he had been since June 1975. He testified that his specialty was in the area of firearm identification and that he handles all cases involving "weapons, ammunition, clothing involved in shootings, ammunition components picked up at the scene in cases." Concerning his education and training, the witness testified that he had received a Masters of Science degree from Auburn University in the area of biological sciences. He testified that his on-the-job training began in early 1971, following his employment with the agency. He also stated that he had "attended several other schools and seminars sponsored by weapon companies such as Remington and Stern, Ruger, Smith & Wesson, and also several other informal seminars throughout the course of [his] twenty years of civil service."
There was no abuse of discretion by the trial court in determining that the witness was qualified to testify as an expert in the field of ballistics and firearms.

IX
The appellant argues that the trial court erred in allowing into evidence "gruesome" photographs of the victim and allegedly inflammatory testimony about the condition of the victim's body, because they were both highly inflammatory and unnecessary to the prosecution's case. The record indicates that the photographs were admitted by stipulation; therefore, no objection was made by the appellant on this ground and any error in their admission must rise to the level of plain error. Rule 45A, Ala.R.App.P. See also Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990) (an appellant's failure to object weighs against his claim of prejudice).
The photographs were introduced to illustrate the testimony of the coroner, as well as the officers who initially arrived at the scene of the offense. "A photograph `is competent evidence of anything, of which it is competent and relevant for a witness to give a verbal description.'" Hill v. State, 516 So.2d 876, 881 (Ala.Cr. App.1987), quoting Harrell v. State, 470 So.2d 1303, 1307 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative.
"`Photographs showing external wounds of a deceased victim are admissible even if the evidence is gruesome, cumulative, and relates to undisputed matters. Ex parte Siebert, 555 So.2d 780 (Ala.1989) [cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)]. Moreover, photographs that depict the position and location of a victim's body at the scene of an offense have been held to be proper. Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987).'
"Oryang v. State, 642 So.2d 979, 989 (Ala. Cr.App.1983)."
Land v. State, 678 So.2d 201, 207-08 (Ala.Cr. App.1995).
*1066 The trial court did not err in allowing these photographs into evidence as they "were relevant to the issues at trial and served to illustrate how the crime occurred." Gaddy v. State, supra, at 1147.

X
The appellant argues that the admission of evidence during the guilt phase about his prior murder conviction was fundamentally unfair and violated his rights to due process. The appellant argues that the introduction of this evidence was prejudicial because, he says, it distracted the jurors from the issue of whether he was guilty in the present case and "tempted them to convict him based on a belief that his involvement in a previous murder demonstrated either that he had a propensity to kill or that he was a `bad' person deserving of punishment." Appellant's brief, p. 49.
The record indicates that the only evidence presented at trial concerning the appellant's prior murder was evidence concerning the conviction itself. The record further indicates that, immediately following the introduction of this evidence, the trial court instructed the jury that it was to consider this evidence for the sole purpose of establishing an element of the offense charged and for no other reason.
However, as stated in Part VII, this court has previously rejected this argument, see Hubbard v. State, supra, at 1215. In discussing this argument, the court in Hubbard analogized the situation to one in Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), wherein the United States Supreme Court determined that a procedure by which the Texas habitual offender statute was enforced was not unconstitutional "because of the possibility of some collateral prejudice to the defendant." Hubbard v. State, supra, at 1215. "By that Texas procedure, prior offenses were alleged in the indictment and proof respecting past convictions was introduced with a charge by the trial court that such prior convictions were not to be taken into account in assessing a defendant's guilt or innocence under the current indictment." Id. This court found no error to the appellant in Hubbard v. State, supra, from the introduction of the prior conviction as an element of the capital murder charge, especially because the trial court instructed the jury that it should not consider the prior conviction as evidence of the appellant's guilt in the capital offense. Id. Similarly, in the present case the trial court's instruction to the jury that the prior conviction could be considered only to prove an element of the capital offense avoided any possible prejudice to the appellant. Moreover, this offense is made capital because the current crime is considered aggravated in that it is a repeated offense.

XI
The appellant argues that he was deprived of his right to confrontation of witnesses, because inculpatory hearsay testimony from witnesses at his first trial was provided to the jury. The appellant refers to an excerpt from the transcript of Judy Wicker's trial in 1982, and argues that allegedly out of "gross negligence," appellant's brief at p. 50, additional testimony by Judy Wicker's sister, Teresa Roland, and her mother, Mary Smith, was included and made available to the jury. Neither Teresa Roland nor Mary Smith testified at the present trial. The appellant specifically argues that the introduction of this former testimony by Teresa Roland and Mary Smith was particularly prejudicial in that it corroborated much of Judy Wicker's testimony in the present trial, including that she picked up the appellant in her car on the morning of February 1, 1982; that she paid the appellant insurance money after the victim was killed; and that she stated in 1982 the appellant had committed the murder.
However, the record indicates that the transcript to which the appellant refers was offered by the appellant as a defense exhibit for the purpose of impeaching the testimony of Judy Wicker. Because this evidence was admitted by the appellant, the error, if any, was invited.
"The invited error rule has been applied equally in capital cases and non-capital cases." Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App.1991), reversed on other grounds, 630 So.2d 88 (Ala.1992) and cases *1067 cited therein. In a situation similar to that of the instant case, McCall v. State, 501 So.2d 496, 499-500 (Ala.Cr.App.1986), the defendant claimed as error the introduction of his statements, although he had introduced the second statement into evidence and testified concerning his first, third, and fourth statements. In that case, this court stated:
"[The appellant] cannot be permitted to introduce evidence of an allegedly inadmissible statement, where the prosecution had made no reference to such statement before the jury, and then claimed that its admission prejudiced his trial. `An accused can not by his own voluntary conduct invite error and then seek to profit thereby. It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.' Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51 (1965). Error can not be predicated upon the admission of a statement introduced and put in the record by the defendant himself. Truex v. State, 282 Ala. 191, 192, 210 So.2d 424 (1968). `Sometimes called the doctrine of invited error, the accepted rule is that whether the injection of allegedly inadmissible evidence is attributable directly to the action of the defense, its introduction does not constitute reversible error.' United States v. Taylor, 508 F.2d 761, 763 (5th Cir. 1975)."
Id. at 499-500. See also McGahee v. State, 554 So.2d 454, 463 (Ala.Cr.App.), affirmed, 554 So.2d 473 (Ala.1989).
Thus, the inclusion in the defense exhibit of the statements of the nonappearing witnesses did not constitute plain error, where they were placed before the jury by the appellant.

XII
The appellant argued that the trial court improperly denied his request for a continuance in order to allow him time for crucial investigation and for his attorney, who allegedly took over the case on the eve of trial, to adequately prepare a defense.[3] The record indicates that the appellant made a motion to remove one of the two attorneys who had been appointed to represent him. The trial court conducted a hearing with the appellant and the other attorney assigned to the appellant's case present. The record indicates that both attorneys had been appointed by the trial court to represent the appellant on June 6, 1991. On the following day, the trial court sent a letter to each attorney stating that they were both to be prepared to go to trial in September 1991, even if one of the attorneys should predecease the other. During the hearing on the appellant's motion, it was clear even through the appellant's statements that the attorney who remained on the appellant's case had taken an active role in representing the appellant. The appellant stated that, although he was uncertain of the date on which the attorneys had been assigned to the case, he recalled that the first time he saw either one was July 3, 1991, when the attorney who remained on the case met with the appellant for over two hours. The appellant ultimately asked the court, during the hearing, to let the remaining attorney represent him, and to allow him to act as his co-counsel. The trial court responded by questioning the remaining attorney as follows:
"THE COURT: All right. Have you worked with [the attorney being removed] in the preparation of the case?
"[Remaining attorney]: Yes, Your Honor.
"THE COURT: Do you have access to his files and any work product that he might have created in preparation for the trial?
"[Remaining attorney]: Yes, I do, Your Honor.
"THE COURT: Do you feel comfortable if I put [the attorney sought to be removed] in a stand-by status, either at the house or in the courtroom and if you need to talk *1068 with him, of course, you would be afforded the opportunity to talk to him. Is that a comfortable arrangement for you?
"[Remaining attorney]: Yes, it is.
"....
"THE COURT: Well, [the attorney sought to be removed] will be in a stand-by status, then, not relieved, but assessable to you... should you need to talk to him, is that all right?
"[Remaining attorney]: Yes, Your Honor.
"THE COURT: All right. That's probably well-suited to the situation, because I believe [the attorney sought to be removed] is ill this morning, is he not?
"[Remaining attorney]: That's is my understanding.
"THE COURT: All right. Well ... if you feel comfortable going forward, and I believe you doI don't want to put words in your mouth, but do you?
"[Remaining attorney]: I am prepared to try the case, Your Honor.
"THE COURT: All right. Your motion is granted, [the attorney sought to be removed] will not sit at the counsel table but will be accessible to [the remaining attorney] should [the remaining attorney] want to avail himself of his advice and consultation.
"[Appellant]: All right, sir."
Thereafter, during the same hearing, the prosecutor also indicated that both attorneys had been present during the discovery conference. The record also contains a number of motions filed by the remaining attorney in the appellant's behalf. There is no indication that the remaining attorney did not have sufficient time or opportunity to prepare for trial.
This court addressed a similar situation in Granville v. State, 624 So.2d 671 (Ala.Cr. App.1992), when the appellant argued that the trial court erred in denying his motion for a continuance in order to have the attorney who had been appointed to advise him as he proceeded pro se appointed as his counsel for trial, on the grounds that the counsel had insufficient time to prepare for trial. The following transpired in Granville v. State, supra:
"Upon transfer to circuit court, counsel was appointed for the appellant, but he vigorously invoked his right to represent himself. Following a full colloquy, the appellant was allowed to represent himself, but the trial court appointed counsel to advise the appellant. The appellant filed a number of pre-trial motions and, on the date of trial, informed the court that he was not able to represent himself effectively. He then asked for a continuance to obtain counsel. The court responded that the counsel he had appointed to advise the appellant was available and the appellant ultimately agreed to allow that attorney to act as his co-counsel. Counsel then requested a continuance in order to prepare for trial. The trial court pointed out that counsel had been acting as legal advisor, upon order of the court, and indicated that, although the request for a continuance was being denied, counsel could have additional time to become more familiar with the case after a jury was selected. The record indicates that the trial court did recess early on the first several days of trial.
"The denial of the continuance did not result in insufficient time to prepare for the case. Swann v. City of Huntsville, 471 So.2d 1268 (Ala.Cr.App.1985). Further, the trial court did not clearly abuse its discretion in denying the motion for a continuance to allow counsel additional time to prepare. Ex parte Saranthus, [501 So.2d 1256 (Ala.1986)]."
624 So.2d at 673.
The appellant has failed to show that the trial court abused its discretion in denying his motion for a continuance, even though the appellant further argues that the trial court also erred in denying him the aid of an investigator who would have questioned vital witnesses, but who had indicted he was unable to do so until early December. The record indicates that during the hearing that the appellant cites as the time during which he impliedly made his motion for a continuance the appellant stated that he had indicated to his attorneys that he was concerned about his need for an investigator, "because there are many aspects of this case that really have never been looked at, from the *1069 defense angle, never." Thereafter, he made another vague reference to his need for a private investigator so that he could "get started on finding these people that don't even live in the State anymore, live in Tennessee, down in Florida and all around, and they haven't been talked to, that have evidence about this case." The appellant gave no further specifics concerning the identity of these witnesses or what information they may have relevant to this case. In his brief on appeal, the appellant also reveals no specifics concerning evidence or witnesses who should have been investigated. Because the appellant has failed to identify these specific claims that should have been investigated and witnesses that should have been interviewed, there was no abuse of discretion by the trial court in failing to grant his motion for continuance. See, e.g., Burrell v. State, 655 So.2d 47 (Ala.Cr.App.1994). "The speculative allegations of defense counsel regarding the possible existence of potential witnesses or evidence are insufficient to show that the trial judge abused his discretion." Connor v. State, 447 So.2d 860, 863 (Ala.Cr. App.1984).
"It is well established, and the parties herein recognize, that granting or refusing a motion for a continuance is a matter within the sound discretion of the trial court. Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Lindsay v. State, 15 Ala. 43 (1848); Dawkins v. State, 455 So.2d 220 (Ala.Cr.App.1984). As we said in Connor v. State, 447 So.2d 860, 863 (Ala.Cr.App.1984);
"`"The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires `a positive demonstration of abuse of judicial discretion.' Clayton v. State, 45 App.App. 127, 129, 226 So.2d 671, 672 (1969)." Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), cert. denied,Ex parte Beauregard, 372 So.2d 44 (Ala.1979). "This Court must determine whether or not there has been an abuse of discretion in light of the circumstances of each case, looking particularly to those reasons that defendant presented to the trial judge." Tucker v. State, 429 So.2d 1165, 1169 (Ala.Cr.App.1983).'
"Therefore, we must look at the reasons the appellant presented to the trial judge to support his motion for a continuance, in order to determine whether he made a `positive demonstration of abuse of judicial discretion.'"
Hays v. State, 518 So.2d 749, 757 (Ala.Cr. App.1985), aff'd in part, reversed in part, 518 So.2d 768 (Ala.1986).
A review of the facts of the present case indicates no showing by the appellant of an abuse of discretion by the trial court. Not only are the appellant's claims unsubstantiated and unspecific, but under the facts of the present case, it is doubtful that any witness could have given testimony resulting in a different outcome. Given the facts of this case and the nature of the prosecution's case, it is doubtful that further preparation by the defense would have changed this trial. Similarly, in Hays v. State, supra, at 758, this court stated:
"The prosecution's case hinged upon the testimony of one witness, James `Tiger' Knowles, the appellant's cohort in crime. According to the record, his testimony constituted more than one-fourth of the State's entire case. We are therefore of the opinion that the following language aptly applies:
"`[W]e are unable to see how more preparation would have significantly changed the course of the trial. The essence of the case against [the appellant] was the testimony of the co-conspirators. They were effectively cross-examined and their testimony rebutted by [the appellant]. The jury apparently believed the co-conspirators.'
"United States v. Uptain, 531 F.2d 1281, 1289 (5th Cir.1976). Likewise, in the instant case, appellant's attorneys subjected all of the State's witnesses, especially the co-conspirator, to a thorough and sifting cross-examination.
"As stated above, the appellant had the burden of proving, and was granted the opportunity to show, actual prejudice."
There was no error in the trial court's denial of the appellant's implied motion for continuance in the present case.

*1070 XIII
The appellant argues that he was denied "basic tools" with which to present his defense, making three specific allegations: that the trial court improperly allowed the appellant to veto motions for psychiatric examination; that the trial court's denial of his request for funds for a "mitigation expert," namely an expert social worker, to investigate his background prevented him from presenting a defense at the sentencing phase; and that the statutory limit on attorney fees violated his due process and equal protection rights, as well as his right to counsel and other constitutional rights.

A.
The appellant argues that the trial court erred in failing to force him to undergo a psychiatric evaluation, in view of motions filed by his attorneys. The appellant states that, before trial, his attorneys filed several motions in an attempt to arrange a psychiatric examination of the appellant. The appellant argues that one of the attorneys stated in a motion that he had evidence that the appellant was "heavily involved in drugs at the time of the crime." The appellant states, in his brief to this court, that these motions were "withdrawn" by him in several "angry" written pleadings because, the appellant submits, his "opposition to a mental health evaluation apparently stemmed in large part from his morbid fear of being moved, even temporarily, from his death row cell at Holman Prison." The appellant argues that the trial court's granting of his wishes violated his rights in that it allowed a client, rather than the criminal defense attorney, to have final say in matters involving trial strategy. The appellant states that, where there is a conflict of opinion between a defendant and his attorney as to a strategic decision, such as whether to obtain a psychiatric evaluation, the attorney's professional judgment must hold sway.
However, in the present case, the appellant was acting as co-counsel pursuant to his own motion. The record indicates that the appellant acted very capably in his role as co-counsel. See Part I. There was no evidence of mental disorder or disturbance presented or evident at trial. Cf. Sibley v. State, [CR-93-1665, March 8, 1996], ___ So.2d ___ (Ala.Cr.App.1996) (wherein the trial court originally granted the appellant's motion, that there was evidence supporting the need for such an evaluation, before the appellant objected to the motion; which objection was improperly granted.) In Clisby v. State, 456 So.2d 86, 92-93 (Ala.Cr.App. 1982), affirmed in part, reversed and remanded on other grounds, 456 So.2d 95 (Ala. 1983), the defendant made a motion for a continuance at the sentencing hearing so that he could be evaluated by a psychiatrist in order to determine whether he suffered from a mental illness that would allow consideration of the mitigating circumstances concerning emotional and mental stability. In determining that the defendant in Clisby was not entitled to this examination, this court cited law dealing with claims of insanity and incompetency to stand trial, holding that the basic principles of these cases are applicable to a psychiatric examination for the purpose of obtaining testimony concerning any mitigating circumstance. This court stated:
"There was no error in overruling the defendant's motion for a continuance so that he could have a mental examination. Simply, there was nothing before the court to compel the trial judge to the conclusion that he should have entertained some doubt of the defendant's mental capacity. Mack v. State, 375 So.2d 476, 489 (Ala.Cr. App.1978), affirmed, 375 So.2d 504 (Ala. 1979), vacated and remanded on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980). `The legislature has not given a right to a defendant to receive a mental examination whenever he requests one.' Pace v. State, 284 Ala. 585, 587, 226 So.2d 645 (1969); Nelson [v. State, 405 So.2d 392 (Ala.Cr.App.1980), reversed on other grounds, 405 So.2d 401 (Ala. 1981)]. Absent such a right, the trial court is the screening agent for such request and should order a mental examination only when there is some legitimate doubt of the defendant's mental condition.
"Although the cases we have cited as authority deal with claims of insanity and incompetency to stand trial, the general *1071 principles they represent are applicable to a psychiatric examination for the purpose of obtaining expert testimony concerning any mitigating circumstance. Such an examination should not be ordered unless there is at least some evidence or indication that some mitigating circumstance might exist."
Clisby v. State, 456 So.2d at 93.
"`It has been repeatedly held by our courts that a denial of funds to pay defense experts for investigations and other assistance does not amount to a deprivation of constitutional rights. Dutton v. State, 434 So.2d 853 (Ala.Cr. App.1983); Thigpen v. State, 372 So.2d 385 (Ala.Cr.App.), cert. denied, 372 So.2d 387 (Ala.1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 690, 62 L.Ed.2d 660 (1980). We have held that this includes psychiatric specialists. Tillis v. State, 292 Ala. 521, 296 So.2d 892 (1074); Dutton v. State, supra. A defendant has no right to receive a mental examination to determine his sanity at State expense whenever he requests one; absent such a right, the trial court is the proper screening agent as to such. Willis v. State, 441 So.2d 1030 (Ala.Cr.App.1983); Dutton v. State, supra; Allums v. State, 368 So.2d 313 (Ala.Cr.App.1979); Robinson v. State, 337 So.2d 1382 (Ala.Cr.App. 1976).'"
Nelson v. State, 511 So.2d 225, 237 (Ala.Cr. App.1986); affirmed, 511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).
"`Although § 15-12-2(d) authorizes payment of court-approved expenses, "[t]he trial judge must find some reasonable basis for the expenditure of state funds before he may authorize" payment under the statute, Wiggins v. State, 440 So.2d 1164, 1167 (Ala.Cr.App.1983) (emphasis added). Once the defendant has been found competent to stand trial and sane at the time of the offense, the trial court's conclusion that there is no "reasonable basis" for further state-authorized psychiatric expenses is prepare. See Whisenhant v. State, 482 So.2d 1225, 1229 (Ala.Cr.App.1982), aff'd in part and remanded in part, Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983), on remand, Whisenhant v. State, 482 So.2d 1246 (Ala.Cr.App.1983), reversed on other grounds, Ex parte Whisenhant, 482 So.2d 1247 (Ala.1984). "Common sense, as well as sound legal authority dictates that the trial judge not grant a psychiatric examination at state expense unless there is some reason to believe the accused was incompetent or insane." Bailey v. State, 421 So.2d 1364, 1367 (Ala. Cr.App.1982).'

Whittle v. State, 518 So.2d 793, 794 (Ala. Cr.App.1987.)"
Thus, in the present case where there was no evidence indicating that the mitigating circumstance might exist, or that the appellant's sanity or competency to stand trial was at issue, the trial court properly denied the appellant's attorneys' motions seeking a psychiatric evaluation, regardless of any responses by the appellant.

B.
The appellant argues that the trial court erred in denying his attorney's request for funds to hire an expert social worker as a mitigation expert, thereby preventing him from presenting a crucial defense at the penalty phase. The record indicates that the appellant stated at trial that he did not wish to present any mitigating evidence during the penalty phase and that he was in favor of the imposition of the death penalty, in view of his experience with the criminal justice system and his ability to appeal his conviction. The appellant argued for the death penalty in light of the heightened scrutiny given in such cases pursuant to Rule 45A, Ala.R.App.P, and, in fact, his second conviction was reversed on the basis of plain error as to an issue not raised on appeal. The appellant made no showing at trial that the assistance of an expert social worker was necessary for an adequate defense or that he had a particularized need for such assistance. Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). An indigent defendant is entitled to expert assistance under the due process guarantee of fundamental fairness as long as he "makes a proper *1072 showing that the requested assistance is needed for him to have `a fair opportunity to present his defense.' [Ake v. Oklahoma, 470 U.S. 68, 76, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985)]." Dubose v. State, 662 So.2d 1189 (Ala.1995). There was no error by the trial court in refusing to grant funds to the appellant in order to hire such an expert.

C.
The appellant argues that the statutory fee limitation of $1,000 imposed on the appellant's attorney deprived the appellant of his right to effective counsel. This claim is raised for the first time on appeal[4] and, therefore, must constitute plain error to require a reversal. Rule 45A, Ala.R.App.P.
According to § 15-12-21, Code of Alabama 1975, a defense attorney representing a defendant in a capital murder case is paid $20 per hour for out-of-court work, and the maximum compensation for such work is $1,000. Thus, the appellant argues that counsel is effectively limited to devoting to no more than 50 hours of out-of-court work to a case involving the death penalty.
However, in Ex parte Grayson, 479 So.2d 76 (Ala), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the Alabama Supreme Court held that the fee limitation imposed for the defense of an indigent death penalty defendant did not violate the defendant's Sixth Amendment right to effective assistance of counsel. In Ex parte Grayson, supra, at 79-80, the Alabama Supreme Court stated:
"These contentions are made on the premise that lawyers will not provide effective assistance unless paid a certain amount of money. But the legal profession requires its members to give their best effort in `advancing the "undivided interest of [their] client[s]."` Polk County v. Dodson, 454 U.S. 312, 318-19, 102 S.Ct. 445, 449-50 [70 L.Ed.2d 509] (1981). This Court, in Sparks v. Parker, 368 So.2d 528, 530 (Ala.1979), quoted the New Jersey Supreme Court as follows:
"`We know of no data to support a claim that an assigned attorney fails or shirks in the least the full measure of an attorney's obligations to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and his pride. [State v. Rush, 46 N.J. 399, 405-07, 217 A.2d 441, 444-45 (1966).]'"
See also Hallford v. State, 629 So.2d 6, 11-12 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994). Because it has previously been held that § 15-12-21, Code of Alabama 1975, does not violate a defendant's right to the effective assistance of counsel, the appellant's claim is without merit.

XIV
The appellant argues that this third retrial of the case against him, was barred on double jeopardy grounds for two reasons: the evidence presented at his first trial was allegedly insufficient to support a capital murder conviction, and the district attorney committed allegedly intentional and outrageous misconduct at his second trial.
The appellant attempts on appeal of his third trial to argue the sufficiency of the evidence presented during his first trial in 1982. He also states in a footnote that no appellate court has ever addressed the question of the sufficiency of the evidence from that trial. However, a review of the record indicates that the appellant's conviction and sentence from his 1982 trial were affirmed on appeal by this court and subsequently his conviction was reversed by the Alabama Supreme Court based on the admission into evidence of details of his prior second degree murder conviction under the identity exception to the general exclusionary rule. This Court's opinion following the appellant's first conviction specifically states that this court "searched the record as required by Rule 45A, Ala.R.App.P. and ... found no error *1073 which adversely affected the rights of the defendant." Arthur v. State, 472 So.2d 650, 663 (Ala.Cr.App.1984), reversed, 472 So.2d 665 (Ala.1995). This court affirmed the appellant's conviction. The Alabama Supreme Court reversed this Court's opinion, not on the grounds of insufficient evidence, but on grounds of improperly admitted evidence. Because there was no finding of insufficient evidence as to the appellant's first trial and conviction, his present argument concerning double jeopardy on this ground is without merit.
The appellant's argument concerning the allegedly intentional and outrageous misconduct by the prosecutor at his second trial is based on dicta in this court's opinion following our holding that the appellant's conviction should be reversed because a statement made by the appellant following his assertion of his right to remain silent was improperly admitted. That language was not stating the grounds for the reversal, but merely drawing attention to statements made by the prosecutor, which should be avoided. In finding these comments were inappropriate and improper, this court did not hold that they constituted reversible error. This court continued, in dicta, to make mention of other possible and potential problems to be addressed on retrial.
Moreover, improper prosecutorial comments may result in a judgment being reversed and a cause remanded for a new trial, but such comments would not reverse and render a cause or bar a retrial. The appellant cites to Oliver v. State, 479 So.2d 1385, 1390 (Ala.Cr.App.1985), arguing that that case indicates otherwise; however, that case addressed a situation where a motion for a mistrial was prompted by judicial or prosecutorial error intended to provoke the motion or harass or prejudice the appellant. The instant situation involves no motion for mistrial and reliance on the language from that portion of Oliver v. State, supra, is misplaced.
The appellant's argument that this retrial should have been barred on the grounds of double jeopardy is without merit.

XV
The appellant argues that his right to be tried in the county where the offense occurred was violated when his third trial was transferred to Jefferson County without his consent. The record indicates that the appellant was first indicted for this offense in Colbert County in April 1982. Following the reversal of the judgment by the Alabama Supreme Court, he was retried in May 1987, and the second trial was conducted in Jefferson County. Following the reversal of the second conviction by this court, the third trial was conducted in Jefferson County. The record indicated that in June of 1990 the Colbert County circuit judge who had tried the case had recused himself and the case was assigned to a trial judge in Jefferson County on May 21, 1991. In a motion filed by the appellant entitled "Defendant Arthur's Motion For Funds For Experts And Investigators," the appellant, requesting funds to hire a public opinion pollster, stated that such a pollster would aid in presenting his motion for a change of venue. He stated in this motion that he wished to conduct a scientific survey of public opinion in Cullman County[5] regarding the public's knowledge of the case and its beliefs concerning his guilt. However, no motion for a change of venue is contained in the record. Moreover, there is no indication in the case action summary sheet that such a motion was ever filed. The case action summary sheet indicates that this case was assigned to the trial judge in Jefferson County, who states in his background of this case that the Colbert County circuit judge had recused. Moreover, there is no objection in the record by the appellant based on the fact that the retrial would be in Jefferson County. In his brief on appeal, the appellant makes no allegation that he was prejudiced by the change of venue; his only contention is that it is blanket error for the trial to have been brought in Jefferson County without his explicit consent.
Following his conviction in Colbert County, while on appeal to this court, the appellant argued that the trial court erred in denying his motion for a change of venue because of *1074 extensive pre-trial publicity. Arthur v. State, 472 So.2d 650, 658 (Ala.Cr.App.1984), reversed, 472 So.2d 665 (Ala.1995). In the statement of the case by this court, following the appellant's second conviction in Jefferson County, this court noted that the appellant's second trial was moved following a change of venue. Arthur v. State, 575 So.2d 1165, 1167 (Ala.Cr.App.1990).
In light of the appellant's argument in his initial trial, it appears that the change of venue was based on the appellant's argument concerning pretrial publicity. Regardless, the appellant's failure to object to venue in the present case weighs against any claim of prejudice on this ground. Kuenzel v. State, supra. Moreover, the appellant makes no allegation that he was prejudiced by the change of venue. There is no requirement that an appellant's consent to a change of venue appear affirmatively in the record and, under the circumstances of this case, where the appellant originally moved for the change of venue following his second trial, there is no indication that the appellant did not consent to this change of venue. Therefore, there is no plain error on this ground. Rule 45A, Ala.R.App.P.

XVI
The appellant argues that he was unconstitutionally prejudiced as a result of having been indicted and prosecuted for two counts of capital murder relating to a single killing. The appellant argues that he was "double-charged" for the same conduct because he was indicted for the capital murder of Troy Wicker in two counts: one for murder by a person previously convicted of murder within 20 years of the current offense, § 13A-5-40(a)(13), Code of Alabama 1975, and the other for murder for pecuniary gain, § 13A-5-40(a)(7), Code of Alabama 1975. The appellant argues that because of the two-count indictment, the jury was made to view his crime as more serious and to see him as more culpable. The record indicates that the prosecutor elected to proceed to the jury on the first count only and that, following the guilt phase, the jury found the appellant guilty as charged in the indictment and, following a sentencing hearing before the jury, it returned one advisory verdict of death and, thereafter, following a separate sentencing hearing for the trial court, the appellant was given one sentence of death by electrocution. The appellant's conviction on one of the two counts of the capital murder indictment did not violate the double jeopardy prohibition against multiple punishments for the same offense.
In Powell v. State, 631 So.2d 289 (Ala.Cr. App.1993), the appellant was charged with murder during a burglary, as well as murder during a robbery in two counts of an indictment, both counts concerning the same victim. In holding that the two counts of the indictment charged two separate offenses and that the State's evidence established two separate offenses, this court stated:
"Murder during a robbery, which was alleged in count one of the indictment is not a lesser included offense of murder during a burglary, which was alleged in count two of the indictment, because under the test established in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and recently reaffirmed by a plurality of the United States Supreme Court as the sole criterion for judging double jeopardy claims in United States v. Dickson [Dixon], 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), each offense required proof of a statutory element that the other did not. The `appellant was properly indicted and convicted for two separate and distinct capital offense "not withstanding a substantial overlap in the proof offered to establish the crimes," Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975).' Jackson v. State, 516 So.2d 726, 763 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
"`[The defendant] was charged with and convicted of two counts of capital murder.... Both of the counts were based on the same act, the intentional killing of [the victim]. However, because each crime contains an element not contained in the other there was no violation of the prohibition against double jeopardy. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 *1075 L.Ed. 306 (1932); Jackson v. State, 516 So.2d 726 (Ala.Crim.App.1985). See also Ex parte Henderson, 583 So.2d 305 (Ala. 1991) (murder during a robbery and murder done for pecuniary gain).'
"Ex parte Haney, 603 So.2d 412, 419 (Ala. 1992) (murder for hire and murder during a robbery), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). See also Merriweather v. State, 629 So.2d 77 (Ala.Cr.App.1993) (murder during a burglary and murder during a robbery); Stewart v. State, 659 So.2d 120 (Ala.Cr. App.1992) (on return to remand) (murder during a robbery and murder during a kidnapping), affirmed as to conviction, reversed as to sentence, 659 So.2d 122 (Ala. 1993)."
631 So.2d at 292. See also Ex parte Haney, 603 So.2d 412, 419 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
In Ex parte McWilliams, 640 So.2d 1015 (Ala.Cr.App.1993), the appellant was charged in a four-count indictment on the capital murder; the fourth count was dropped at the close of the State's case. The appellant claimed that his rights against double jeopardy were violated because, he says, he was charged with and convicted of three counts of capital murder: two counts of murder made capital because it occurred during a robbery and one count of murder made capital because it occurred during a rape. He received one sentence of death. In holding that this double jeopardy claim was without merit, the Alabama Supreme Court stated:
"In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of the coverage of the Double Jeopardy Clause, as follows:
"`The Double Jeopardy Clause embodies three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pierce [Pearce], 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d [L.Ed.] 306 (1932),] test was developed "in the context of multiple punishments imposed in a single prosecution." Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985).'
"Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in the three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala.1985).
"In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King [v. State, 574 So.2d 921 (Ala.Cr.App.1990)] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
"In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that `the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).
"In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew that McWilliams's crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended. Even if McWilliams's rights against double jeopardy had been violated by the two convictions of robbery-murder, the convictions for one count of robbery-murder, the convictions for one count of rape-murder *1076 would remain; and either of these would be sufficient to support a death sentence."
640 So.2d at 1022.
Based on the above-quoted cases, the appellant's conviction of capital murder on the first count of a two-count indictment for murder by a person who has been convicted of another murder in the past 20 years, in violation of § 13A-5-40(a)(13), and for intentionally causing the death of the same victim by shooting him with a pistol for pecuniary or other valuable consideration, in violation of § 13A-5-40(a)(7), was proper and neither unduly prejudicial nor unconstitutional.

XVII
The appellant argues that the trial court prevented him from presenting crucial evidence in his defense when it denied his motion to exhume the victim's body. Specifically, the appellant argues that the prosecutor, without any evidentiary support, insinuated to the jury that the appellant had drugged the victim with scopolamine. The appellant further argues that, in order to rebut these insinuations, he made a pre-trial motion seeking permission to exhume the victim's body in order for a pathologist to perform tests to determine whether there were any traces of this drug in the body. The appellant argues that he anticipated these claims by the prosecutor because of his prior trials.
The record indicates that a hearing on this motion was held outside the presence of the jury. Dr. Jorge Pirl, formerly of the Alabama Department of Forensic Sciences and currently the supervisor of the toxicology section of the Department of Public Health for the State of Illinois, testified that in a case in which a victim had been buried for over 10 years, any scopolamine that was present in the body at the time of death could not be detected. Moreover, there was testimony concerning the post-mortem examination on the victim, indicating that there was no evidence of scopolamine in the victim's fluids. This evidence was admitted in the presence of the jury and the appellant had the opportunity to argue concerning this evidence.
The insinuations to which the appellant alludes made by the prosecutor concerning scopolamine, relate to questions by the prosecutor in eliciting testimony that the appellant had asked questions of another witness concerning the nature of the drug, also referred to as "knock-out drops," and whether the witness could get any of it. The State presented no further evidence that the appellant purchased or received this drug, or that he administered it to the victim.
Although the prosecutor's questions concerning this drug may have been irrelevant under the facts of this case and in view of the evidence presented, the questioning was not reversible, nor was the trial court's denial of the appellant's motion to exhume the body for testing an abuse of its discretion. The latter is true especially in light of the expert testimony that the drug would not be detectable even if the body were exhumed. In State v. Pass, [Ms. No. 56, Jan. 7, 1992], 1992 WL 1410 (Tenn.Crim.App.1992), the Tennessee Court of Appeals quoted State v. Jefferson, 529 S.W.2d 674, 691 (Tenn.1975), stating, "In Dennis v. State, 198 Tenn. 325, 279 S.W.2d 512, the court held that the court, in its discretion, may order exhumation of a body when the necessity for same is sufficiently made to appear." The Tennessee Court of Appeals further noted that the exhumation of the body of a victim is a matter within the discretion of a trial court.
In Garcia v. State, 522 S.W.2d 203 (Tex. Cr.App.1975), the appellant filed a motion to exhume the victim's body and alleged that the trial court erred in failing to grant his motion because it was necessary to perform a "paraffin test." The prosecutor argued that the body had been washed before burial and there was no evidence that the delayed paraffin test would be effective in proving anything. The trial court then requested scientific expert testimony from the appellant that such a test would aid in proving "anything" by the time of trial. The defendant in Garcia v. State, supra, declined to present any such evidence. The Texas Court of Appeals stated:
"In Montes [v. State, 503 S.W.2d 241 (Tex. Cr.App.1974)], we held that where no benefit could be shown from the examination *1077 and testing of narcotic paraphernalia, no error would result from the denial of such an examination. Thus, we have no evidence before us to conclude that such information from a `paraffin test' would have been helpful in the determination of appellant's issue of self-defense. Gutierrez v. State, 502 S.W.2d 746 (Tex.Cr.App.1973).
"Denial of the exhuming of a body is not error unless it can be shown that such examination will tend to solve any important or material issue in the case. Johnson v. State, 106 Tex.Cr.R. 482, 293 S.W. 173 (1927). Further, the exhuming should not be allowed in any case unless it was imperatively demanded under the circumstances and was necessary for the due administration of justice. Shields v. State, 89 Tex.Cr.R. 421, 231 S.W. 779 (1921). As appellant has failed to reveal any evidence that the `paraffin test' would benefit him when conducted over eight (8) months after burial, his third ground of error is overruled."
522 S.W.2d at 208. See also Flynn v. State, 667 S.W.2d 235 (Tex.Cr.App.1984), aff'd, 707 S.W.2d 87 (Tex.1986) (there was no error in the trial court's denial of the appellant's motion to exhume the victim's body based on his contention that such exhumation might produce evidence suggesting multiple assailants other than himself, where the court found that at best the evidence might suggest multiple stabbing instruments, which would have been consistent with the State's theory of the defendant's guilt as a party).
In Commonwealth v. Kivlin, 267 Pa. Super. 270, 406 A.2d 799, 804-05 (1979), the appellant argued that the trial court abused its discretion in denying his motion to exhume the body of the victim in order to adduce evidence allegedly proving that he did not fire the bullet causing death, by examining the bullet wound and residue around the wound. However, experts testified that traces of residue remaining on the body after washing, embalming, and burial would be diminished. The Superior Court of Pennsylvania stated:
"Admission or exclusion of evidence is a matter within the sound discretion of the trial court. Commonwealth v. Hart, 479 Pa. 84, 387 A.2d 845 (1978). Exhumation of the victim's body is to be allowed only under extraordinary circumstances. Where existence of the evidence sought was so speculative and uncertain, and its value in aiding appellant's defense so conjectural and remote, the trial court properly exercised its discretion in refusing appellant's motion. See Commonwealth v. Grether, supra [204 Pa. 203, 53 A. 753 (1902)] (exhumation at request of prosecuting attorney proper where evidence obtained would `conclusively' prove that the defendant fired the fatal bullet); Taylor v. State, 260 Ind. 264, 295 N.E.2d 600 (1973), cert. den., 414 U.S. 1012, 94 S.Ct. 377, 38 L.Ed.2d 250 (1973); State v. Whiteaker, 499 S.W.2d 412 (Mo.1973), cert. den., 415 U.S. 949, 94 S.Ct. 1472, 39 L.Ed.2d 565 (1974); State v. Jefferson, 529 S.W.2d 674 (Tenn.1975).
"Evidence presented at trial demonstrates that appellant was not prejudiced by the court's decision. First, the trial confirmed that the evidence appellant's sought likely did not exist.... Second, the evidence revealed that, even assuming discovery of all information appellant alleged exhumation would produce, appellant's defense would not have been furthered.... Finally, the location of the guns held by [an accomplice whom the appellant alleged committed the offense], appellant and appellant's colleagues at the time of the shooting was never established so exactly that calculation of the angle of entry would determine the spot from which the bullet was fired."
406 A.2d at 805.
The factual situation in this case does not indicate that exhuming the body was necessary to the fair administration of justice. Whether the body should be exhumed was a matter for the trial court to determine in its discretion; the court did not abuse that discretion.
"The rules stated at 22 Am.Jur.2d, p. 568, Sec. 19, as follow, is sound:
"`The right of relatives of the deceased person to have his corpse remain undisturbed after burial must yield to the public interests, and in a prosecution *1078 for homicide, the exhumation of the victim's remains may be ordered on the application of the state or of the defendant where it appears to be absolutely essential to the administration of justice. Thus, where the question of the guilt or innocence of the accused can not be determined except by exhumation and autopsy of the body of the deceased, the court may and should order the disinterment even against the will of his relatives, and even though there is no statute specifically authorizing such proceedings. However, whether exhumation will be allowed is a discretionary matter for the court....'"
State v. Whiteaker, 499 S.W.2d 412, 417 (Mo. 1973), cert. denied, 415 U.S. 949, 94 S.Ct. 1472, 39 L.Ed.2d 565 (1974). See also Bottoson v. State, 443 So.2d 962, 964 (Fla.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984).

XVIII
The appellant argues that the trial court erred in denying certain of his discovery requests, specifically his request for the grand jury testimony and the voting and arrest records of the venire. The appellant makes claims that his due process and other constitutional rights were violated when he was not provided with a transcript of testimony before the August 1991 grand jury. He gives no specific requests or reasons for this request. Sections 12-16-214 through -220, Code of Alabama 1975, reveal the importance of protecting the sanctity of grand jury proceedings in this State by maintaining their secrecy. The Alabama legislature set forth the reasons for this secrecy in § 12-16-214:
"The legislature hereby finds, declares and determines that it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate. The provisions of this division are to be construed for the accomplishment of this purpose and to promote the following:
"(1) That grand juries have the utmost freedom in their discussions, deliberations, considerations, debates, opinions and votes without fear or apprehension that the same must be subsequently disclosed, or that they may be subject to outside pressure or influence or injury in their person or property as a result thereof.
"(2) That those persons who have information or knowledge with respect to the commission of crimes or criminal acts be encouraged to testify freely and truthfully before an appropriate grand jury without fear or apprehension that their testimony may be subsequently disclosed, or that they may be subject to injury in their person or property as result thereof.
"(3) That those persons who have committed criminal acts or whose indictment may be contemplated not escape or flee from the due administration of justice.
"(4) That those persons falsely accused of criminal acts are not subject to public scrutiny or display and their otherwise good names and reputations are left in tact."
While it is true that broader discovery is to be allowed in cases involving capital murder because of the possible imposition of the death penalty, Ex parte Monk, 557 So.2d 832, 836-37 (Ala.1989), a defendant must make a preliminary showing of particularized need before a court can balance this need against the policy favoring grand jury secrecy. Cf. In re Disclosure of Evidence, 650 F.2d 599, modified, 662 F.2d 362 (5th Cir.1981) (pursuant to Rule 6(e)(3)(C)(i), Federal Rules of Criminal Procedure, matters before a grand jury may be disclosed by court order preliminary to, or in connection with, a judicial proceeding when a showing has been made of "particularized need" and "compelling necessity"; however, the policies favoring the secrecy grand juries must still be given weight. Id. at 601.).
"Before a defendant is allowed to inspect a transcript of a State's witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343, 79 S.Ct. 1217, *1079 3 L.Ed.2d 1287 (1959)] and Pate [v. State, supra, 415 So.2d 1140 (Ala.1981)], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant's testimony. In this case no such showing was made and the existence of any inconsistency between the witness' trial and grand jury testimony was never even alleged. Cooks [v. State, supra, 50 Ala.App. 49, 276 So.2d 634 (1973)]. Also, there was no showing that the witness' grand jury testimony, if available, was `of such nature that without it the defendant's trial would be fundamentally unfair.' Cooks, 50 Ala.App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321 (1924) (`Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.')
"In laying the proper predicate for examination of a witness' grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
"`When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.' Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437, cert. dismissed, 280 Ala. 718, 197 So.2d 447 (1966).
"Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury `differed in any respects from statements made to the jury during trial,' Pate, supra, and (2) whether the grand jury testimony requested by the defendant `was of such a nature that without it the defendant's trial would be fundamentally unfair.' Pate, supra. This procedure will best preserve and protect the legislative determination that `it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate.' Alabama Code 1975, Sections 12-16-214 through 226."
Millican v. State, 423 So.2d 268, 270-71 (Ala. Cr.App.1982).
In the present case, the appellant has failed to make the preliminary showing necessary before the secrecy surrounding grand jury proceedings may be abrogated.
As to the appellant's contention that the trial judge improperly denied him access to the veniremembers' voting records and arrest records, the record contains a pre-trial motion made by the appellant entitled "Defendant Arthur's Motion For Discovery of All Voting Records and Other Information Concerning Potential Jurors," in which the appellant requested voting records, arrest and conviction records, and other background information defense counsel "believed" was in the possession of the district attorney. Defense counsel further stated in this motion that, as an indigent, the defendant did not have the resources to compile comparable information on the jurors, even if the information were available to him. However, there is no indication that this motion was ever brought to the attention of the trial court and, although signed by defense counsel, there is no indication that this motion was ever ruled on by the trial court. Thus, on the face of the record, there is no indication that the appellant was not afforded these records.
"`"This court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record." *1080 Smelcher v. State, 520 So.2d 229 (Ala.Cr.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Cr.App.1986). "Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done." Jolly v. State, 405 So.2d 76 (Ala. Cr.App.1981); Watson v. State, 398 So.2d 320 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).'
"Owens v. State, 597 So.2d 734, 736 (Ala. Cr.App.1992)."
Gaddy v. State, 698 So.2d at 1130.
Even if the prosecutor failed to supply the appellant with the arrest and conviction records of potential jurors, this would not constitute reversible error in the present case.
"This court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and that a trial court will not be held in error for denying an appellant's motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977). Cf., Clifton v. State, 545 So.2d 173 (Ala.Cr.App.1988) (the nondisclosed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App. 1984), aff'd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala. 1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state's witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1983) (no absolute right to disclosure of criminal records of state's witnesses).
"Several jurisdictions have similarly held. See, e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982) (trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant's motion for pretrial discovery of state's juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990) (defendant is not necessarily entitled to `rap sheets' of prospective jurors); State v. Weiland, 540 So.2d 1288 (La.App.1989) (defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant's voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989) (no right to discovery of criminal records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Annot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571, § 4(a) (1978), and the cases cited therein.
"Also, the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant's defense)."
Kelley v. State, 602 So.2d 473, 477-78 (Ala. Cr.App.1992). Because the appellant had no absolute right to this information, and this information could have been learned from the veniremembers directly, there was no error on this ground.

XIX
The appellant argues that during voir dire examination the prosecutor improperly extracted promises from jurors to rely on particular evidence. Specifically, the appellant refers to the prosecutor's questions of the *1081 venire whether the members would tend to disbelieve the testimony of Judy Wicker because of her prior conviction resulting from her involvement in this case, and whether the venire would tend to disbelieve her testimony because of the State's offer to "put in a good word" with the parole board concerning her upcoming application for parole. The record indicates that the appellant did not object to either of these questions by the prosecutor; therefore, they must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
It is clear that potential jurors may be asked about their backgrounds and their ability to weigh the evidence objectively; moreover, they may be questioned to search out any bias, hostility, or predisposition to believe or discredit the testimony of potential witnesses. See, generally, People v. Madera, 216 A.D.2d 89, 628 N.Y.S.2d 87, 88 (N.Y.A.D.1995). See also Edwards v. State, 882 S.W.2d 493, 495 (Texas App.1994) (trial counsel may permissibly inquire into whether a potential juror would automatically be predisposed toward one view on witness credibility, based on just knowing one thing about that witness.)
"A question asking, `Are you automatically predisposed to believe the testimony of a witness shown to have lied previously?' constitutes an inquiry about any automatic predisposition venire members might have harbored, based on knowing just one thing about the witness. Defense counsel asked a version of that question in the exchange set forth above.
"There is no bright line distinction between a proper general inquiry on voir dire into potential sources of juror bias and a question that improperly seeks to commit a prospective juror to a position concerning a specific set of facts. Each case must turn on its own facts....
"A question is considered proper if it seeks to discover a juror's views on an issue applicable to the case. Maddux v. State, 862 S.W.2d 590, 593 (Tex.Crim.App. 1993); Nunfio [v. State, 808 S.W.2d 482, 484-85 (Tex.Crim.App.1991)] (citing Hernandez [v. State, 508 S.W.2d 853 (Tex. Crim.App.1974)]); Stringfellow [v. State, 859 S.W.2d 451, 452 (Tex.App.Houston 1993)] 859 S.W.2d at 452."
In a case similar to the present one, an appellant argued in a capital murder case that the prosecutor improperly "obtained assurances of veniremembers, over defense objection, that they would believe the testimony of a co-defendant in the case." DeBruce v. State, 651 So.2d 599, 611 (Ala.Cr.App.1993), affirmed, 651 So.2d 624 (Ala.1994). In DeBruce v. State, the prosecutor asked the veniremembers the following:
"`Do any of you, if any of these people who took part in the crime were called as a witness in this case, do you think the fact that they took part in the crime, that you just wouldn't believe them just because they took part in the crime? Is there anyone of you who feels that way? Do any one of you feel that because they took part in the crime and they were called as a witness and they would receive a lesser sentence than what the defendant is being tried for? Is there anyone of you that because of that fact, would not believe them just strictly because of that fact.'"
651 So.2d at 611. In holding that this was a proper line of questioning by the prosecutor, this court stated:
"The prosecutor's inquiry was proper. See Ex parte Webb, 586 So.2d 954, 955 n. 1 (Ala.1991), noting the correctness of this Court's holding in Nodd v. State, 549 So.2d 139, 147 (Ala.Cr.App.1989), that `where the State's case consists primarily of police testimony and that testimony is crucial in establishing the State's case, the defense has a right to inquire, either through counsel or the trial judge, whether any member of the jury venire might be more, or less, inclined the credit the testimony of a police officer simply because of his or her official status.'"
651 So.2d at 611.
The questioning by the prosecutor did not amount to the extraction of promises, but was merely an examination of potential jurors in order to determine possible biases or hostilities. This questioning was proper.

*1082 XX
The appellant argues that the trial court erred in asking jurors whether their views on the death penalty would prevent them from considering a death sentence, but not making the same inquiry as to a life sentence. The record indicates that the appellant failed to object on this ground in the trial court; therefore, this issue must be analyzed pursuant to the plain error rule. Rule 45A, Ala. R.App.P.
It is well settled in Alabama that a trial court's failure to "life-qualify" a jury does not result in plain error. Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Dill v. State, 600 So.2d 343, 363 (Ala.Cr.App.1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Henderson v. State, 583 So.2d 276, 283-84 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).

XXI
The appellant argues that the trial court improperly removed several jurors who did not indicate that their views on capital punishment would impair their ability to fairly consider both a life and death sentence. Specifically, the appellant argues that two potential jurors who were struck for cause because of their personal feelings against the death penalty, in fact, gave equivocal answers concerning their abilities to set aside these attitudes and, therefore, should not have been struck.
Concerning one of the veniremembers to whom the appellant objected, the record indicates that he originally indicated that he was opposed to capital punishment and was therefore individually questioned by the trial court as follows:
"Q. Could you impose the death penalty under any conceivable circumstances? If I told you jurors sitting in punishment about the law that applies, the aggravating circumstances, if any, that would speak for the death penalty that you people must consider as weighed against mitigating circumstances that would be argued by the defense sidein other words, you don't just retire and come out with a verdict that tells us how you feel generally about the death penalty, but it is a very specific fact-finding mission that you are on, with legal instructions that I would give you. Could you be a conscientious juror and consider both modes of punishment?
"A. I really couldn't. I wouldn't have a clear conscience if II'm just strictly against the death penalty, regardless of the circumstances.
"Q. Regardless of what the judge said or the law? And I am not getting on you, I just want your understanding. You would not listen to anybody like me on the law of Alabama on the death penalty. You know going in that you would never vote for it?
"A. That's true, yes.
"Q. That is a fair statement?
"A. Fair statement.
"THE COURT: [Defense counsel], do you have any questions of the man?
"[Defense counsel]: No.
"Q (BY THE COURT) Do you want to make a general statement, sir?
"A Well, I'm just opposed to the death penalty in its form, because I feel no man has the right, or the State or the Federal Government has the right to take a life.
"Q So, under no circumstances, no matter what I said or what the evidence was, you would vote against the death penalty?
"A YesI would, yes.
"Q Well, I appreciate your candor in making your statement.
"THE COURT: If you would wait right outside, I will be back to you in just a second.
"(Whereupon, [this prospective juror] left the judge's chambers and the following was had and done out of the presence and hearing of the jury:)
"THE COURT: Is there a motion on [this prospective juror]?
"[Prosecutor]: Yes, sir, we would challenge [this prospective juror] for cause.
"THE COURT: All right. He will be off.
"[Defense counsel]: Objection.

*1083 "THE COURT: All right.... This man was unequivocal that he wouldn't vote for the death penalty under any circumstances."
This court has stated:
"`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [657-58], 107 S.Ct. 2045, 2051 [95 L.Ed.2d 622] (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, [484 U.S. 836,] 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-answer sessions which obtain results in the manner of a catechism." Id.

"Martin v. State, 548 So.2d 488, 490 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989)."
Bush v. State, 695 So.2d 70, 109 (Ala.Cr.App. 1995).
"`A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that's peculiarly within a trial judge's province." [Wainwright v.] Witt, 469 U.S. [412, 428], 105 S.Ct. [844, 855, [83 L.Ed.2d 841 (1985)].
"`That finding must be accorded proper deference on appeal. Id. "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).' "Martin v. State, 548 So.2d 488, 490 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989)."
Johnson v. State, 651 So.2d 1085, 1087 (Ala. Cr.App.1994). See also Smith v. State, 646 So.2d 704 (Ala.Cr.App.1994).
Pursuant to the questioning and answers given by the prospective juror, it is clear that he was properly removed for cause under the guidelines of Wainwright v. Witt, supra.
As to the other potential juror, the record indicates that the juror was extensively questioned initially by the prosecutor and then by the trial court. Thereafter, the trial court noted that the juror seemed to change positions frequently and, therefore, it was getting "two different readings" pursuant to the potential juror's responses. He then asked the appellant and the prosecutor whether they could, by agreement, remove the potential juror. However, the appellant stated that he would not agree to that arrangement, especially in light of the fact that he planned on asking for the death penalty should he be convicted. The trial court then asked the potential juror to return for questioning. Upon this final questioning, the juror clearly indicated that, despite any instructions from the trial court or the administration of any oath, he could not, under any circumstances, vote for the death penalty. The trial court then removed the potential juror for cause. The transcript reflects the following dialogue took place regarding this matter:
"VOIR DIRE EXAMINATION
"BY [the prosecutor]:
"A. [Prospective juror], let me ask you this: You understand that at this point in the case, you haven't been seated on the jury yet and you are not required at this point to agree with the law or agree to follow the law. The only thing that you have agreed to do so far is to answer truthfully any questions that might be asked you with regard to your jury service, you understand that?
"A. Yes, sir.

*1084 "Q. It is okay if you disagree with the death penalty and you couldn't vote for it under any circumstances, you are free to tell us that is that's the way you feel.
"Let me ask you this: If it came down to a question of death or life imprisonment without parole, can you tell me now that you would be one way or the other, all the way, regardless of what the facts are in the case?
"A. I understand, sir. I could not convict him of the death penalty.
"Q. In other words, you are telling me at this point, without knowing any facts of the case of anything, that always if you were faced with that question, if you were a juror in the penalty phase and you are faced with that question, you would have to say life imprisonment without parole as opposed to death?
"A. Yes, sir.
"Q. Regardless of what aggravating and mitigating circumstances might have been proven, or whatever?
"A. Yes, sir.
"Q. Okay. Let me ask you this one further question: Do you feel like that havingyou understand what the judge told you earlier about a capital case being in two phases, the first being a guilt phase and then a penalty phase?
"A. Right.
"Q. And as a general rule, the same jury sits in both phases of the case. Do you feel like if you were selected as a juror in this case, that the question looming out there of death or life imprisonment without parole might in some way affect your ability to be a fair and impartial juror in the guilt phase? In other words, you might reason in your mind, let's find him guilty of some lesser included offense so I can avoid having to make that decision, would that be a possibility?
"A. No.
"Q. You feel like you could check out the law and apply it to the facts and be fair and impartial in the guilt phase, but the only problem you see is in the penalty phase, is that right?
"A. Yes, sir.
"Q. Your feelings about the death penalty, those are strongly held feelings?
"A. Yes.
"Q. And is that just a personal conviction or religious conviction?
"A. It is both, sir.
"Q. And it is a conviction that you don't feel like you could give up easily?
"A. No, sir.
"[Prosecutor]: I believe that's all.
"THE COURT: We always get different statements, depending on who asks the questions.
"May I ask you a couple of more questions?
"VOIR DIRE EXAMINATION
"BY THE COURT:
"Q. I understood, and I might be wrong, I might have understood you wrong, but let me ask you again, if I charge the jury on death and the aggravating circumstances that might speak for death, and if I charge the jury on life without parole and what speaks for that, mitigating circumstances, could you consider both modes of punishment conscientiously as opposed to going into the litigation knowing now to a certainty that you would not in good faith consider death?
"Could you consider the death penalty? If I gave you a charge concerning the death penalty that is based upon the law, or do you know going in that you wouldn't think about what the judge is saying up there?
"A. Judge, due to my feelings toward the death penalty, I could not, on the punishment side, convict to death, even if the evidenceas far as the law has been proven, I could find a person, I feel, guilty if the evidence is there. But the punishment, that's where I have a problem with it.
"THE COURT: Let me talk to the lawyers out of your presence for just a minute. Don't leave yet, just stand outside the door.
"(Whereupon, [prospective juror] left the judge's chambers and the following was *1085 had and done out of the presence and hearing of the jury:)
"THE COURT: I am getting two readings from this man. Yes, sir, Mr. Arthur.
"MR. ARTHUR: Your Honor, in a situation like him saying that he could be impartial on the guilt phase, would it beI want to be fair with him, because I want him to be fair with me. Would it be fair to tell these death penalty problem people what I told you a while ago, would that be legal?
"THE COURT: Mr. Arthur wants to tell medid tell me through a note that he is going to ask for the death penalty. And you are familiar with that, [prosecutor].
"[Prosecutor]: Yes.
"THE COURT: I think it would be premature to do that.
"MR. ARTHUR: Okay. I wanted to be completely honest with the jurors because I want them to be honest with me.
"THE COURT: Can we get together on [this juror] on agreement? I am getting double readings from him, and I have done so well on this agreement business that I am going to keep asking.
"Harold, do you think [this juror] can go out by an agreement with the State?
"[Defense counsel]: No, I think he ought to stay.
"[Prosecutor]: I am going to have to challenge him for cause, because he indicatedof course, you may have gotten two readings from him, but he indicated at one point that his feelings and convictions about the death penalty were so strong that he could tell me at this time that if he was faced with the question of death or life imprisonment without parole, he would always have to go for life imprisonment without parole.
"THE COURT: All right. We will bring him back and make sure I understand how he feels.
"(Whereupon, [the prospective juror] was brought back into the judge's chambers and the following was had and done out of the presence and hearing of the jury:)
"VOIR DIRE EXAMINATION
"BY THE COURT:
"Q. [Prospective juror], another minute of your time so I don't make any misunderstanding here. There are no circumstances under the sun, none under which you would note for the imposition of the death penalty? No matter what the law was or what the evidence was, you would never vote for the death penalty?
"A. Yes, sir.
"Q. Is that a correct statement?
"A. That's a correct statement.
"THE COURT: [Defense counsel], do you want to ask this man any questions?
"[Defense counsel]: No.
"THE COURT: Well, I think I have an understanding, then. I was getting a different opinion, in my own mind, about what you were saying, but I am going to put you in that category of an individual who states under no circumstances imaginable could you vote for the death penalty.
"And that would be in spite of the fact that you would take an oath, `I swear to bring in a verdict based on the law and the evidence.' See, the law imposes the standard to consider the death penalty. So, I don't think you could take that oath, do you?
"[Prospective juror]: No, sir.
"THE COURT: I appreciate it. We have enjoyed sharing your thoughts with you."
"(Whereupon, [the prospective juror] left the judge's chambers and the following was had and done out of the presence and hearing of other jury:)"
Because the prospective juror's final questioning revealed his unconditional refusal to consider the death penalty, there has not been a showing of abuse of discretion by the trial court. Siebert v. State, 562 So.2d 586, 596 (Ala.Cr.App.1989), affirmed, 562 So.2d 600 (Ala.1990), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990)." 'Where a juror vacillates in her response to voir dire, her answers must be "taken as a whole." Knop [v. McCain, 561 So.2d 229, 233 (Ala.1989) ]; Ex parte Beam, 512 So.2d 723, 724 (Ala.1987). Thus, when the aggregate effect of her response tends to verify the existence of "deep-seated impressions" *1086 she must be excluded for cause. Knop, 561 So.2d [at] 233.' Dixon v. Hardey, 591 So.2d 3, 7 (Ala.1991)." Smith v. State, 646 So.2d 704, 714 (Ala.Cr.App.1994). As the Alabama Supreme Court noted in Roberts v. Hutchins, 613 So.2d 348, 350 (Ala.1993):
"We emphasize that a trial judge is given broad discretion in regard to sustaining or denying a challenge for cause, and his decision is therefore entitled to great weight and will not be interfered with unless it is clearly erroneous and equivalent to an abuse of discretion. Kumar v. Lewis, 561 So.2d 1082 (Ala.1990). Here, it is clear that the trial court based its determination on its own observations and impressions of the potential jurors, not upon an inadequate application of own opinion in Dixon [v. Hardey, 591 So.2d 3 (Ala 1991)]. The record indicates no abuse of the trial court's discretion; therefore, the judgment is affirmed."

XXII
The appellant argues that it was error for the trial court to allow the jurors to separate overnight after jury selection but before trial. The record indicates that, before the veniremembers were questioned, the trial court asked the defense counsel to discuss with the appellant the possibility of a limited separation of the jurors after they had been selected but before they were sworn. The trial court stated that this would enable them to gather their personal belongings for the trial during which they would be sequestered. Following a recess, defense counsel informed the trial court that he had spoken with the appellant and that neither he nor the appellant objected to the jury's being separated that night. The following then transpired:
"THE COURT: All right. The proposal is, Mr. Arthur, is that the petit jury be selected today and then be allowed to go home and secure their belonging, medicine, books, whatever, magazines, and report to the hotel in the morning. Thereafter they will be sequestered.
"MR. ARTHUR: Uh-huh.
"THE COURT: I will swear the jury in tomorrow morning, no testimony will be adduced today. Do we have your permission, sir, to follow that format?
"MR. ARTHUR: No problem at all, Judge.
"THE COURT: All right. [Defense counsel]?
"[Defense counsel]: Yes, sir.
"THE COURT: And [prosecutor]?
"[Prosecutor]: Yes, sir, I don't have any problem with that.
"THE COURT: Very good. Thank you.
The jury will certainly appreciate that."
The jurors were then allowed to separate for the night after having been selected, but before they were sworn.
The appellant agreed to this separation and has shown no prejudice caused by it. There is no indication or claim that any juror was influenced by outside causes during the separation.
Pursuant to § 12-16-9(a), Code of Alabama 1975:
"If the accused and his counsel and also the prosecuting attorney, in any prosecution for a capital felony consent thereto in open court, the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial, whether the jury has retired or not. A separation so permitted shall not create a presumption of prejudice to that accused, but on the contrary it shall be prima facie presumed that the accused was not prejudiced by reason of the separation of the jury."
In Ex parte Musgrove, 638 So.2d 1360, 1364 (Ala.1993), cert. denied, Rogers v. State, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994), the appellants objected to the separation of the jury in their case on a Sunday. The Alabama Supreme Court, however, noted that defense counsel had objected before trial to the trial court's decision to sequester the jury and had suggested a Sunday recess. Therefore, the Court stated that "[f]or the defendants now to contend that the Sunday recess requested by defense counsel caused a `separation' of the jury that entitles them to a new trial nearly rises to the level of invited error." The Court concluded that, because there was no indication in the record of any *1087 actual prejudice to the appellant, there was no plain error on this ground.
Moreover, in Ex parte McWilliams, 640 So.2d 1015, 1023 (Ala.1993), the Alabama Supreme Court determined that the appellant's claim that the jury had been improperly allowed to separate without his consent after being struck but before being sworn was without merit. The Alabama Supreme Court based this decision on its holding that § 12-16-9(a), Code of Alabama 1975, applies only to the separation of the jury during the pendency of the trial. Therefore, as the jury's separation in the present case was also before trial, the appellant's claim is without merit.

XXIII
The appellant argues that his right to a reliable sentencing determination was violated because the trial court gave the jury at the penalty stage a verdict form allowing only for a recommendation of death. The record indicates that the jury was fully and properly instructed as to the two possible sentences that it could return pursuant to the appellant's conviction. The trial court further instructed the jury that the actual vote of the number of jurors finding death as the appropriate sentence, as well as the number of jurors finding life without parole as the appropriate sentence had to be reflected on the verdict form. No objection was ever raised by the appellant concerning the verdict form at sentencing. Therefore, any error must analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
Although the record contains only the signed verdict form, in which the jury returned an advisory verdict recommending death by a vote of 11-1, the absence from the record of the unsigned verdict form that was not selected by the jury does not necessarily indicate that it was only provided with one verdict form. The record contains a statement by the trial court referring to the "forms" which the clerk would provide to the jury. Cf. Davis v. State, 682 So.2d 476 (Ala. Cr.App.1995).
The trial court properly instructed the jury that it was to return a sentence of either death or life imprisonment without parole. The court instructed the jury that, if the evidence convinced them beyond a reasonable doubt that at least one aggravating circumstance existed and if it outweighed the mitigating circumstances, their verdict would be: "`We the jury find the defendant, Thomas Douglas Arthur, be punished by death.'" The trial court then stated that the vote was to be indicated by the blanks on that form. The trial court then instructed the jury that, if after the same review of the record, they were to determine that the mitigating circumstances outweighed the aggravating circumstance, or if the jury did not conclude that at least one aggravating circumstance existed, its verdict would be: "`We the jury find the defendant, Thomas Douglas Arthur, be punished by life imprisonment without parole.'" The trial court stated that, "again, there would be blanks on that form for the numerical count of the vote." These instructions by the trial court, as well as its reference to "forms" in the supplemental record, indicate that two forms were delivered to the jury. Cf. Roy v. State, 680 So.2d 935 (Ala. Cr.App.1996) (wherein the record only contained one verdict form and the trial court only instructed the jury as to that single verdict, indicating that the jury was improperly solely given that one option.) "`This court cannot predicate error on matters not shown by the record, nor can we presume error for a silent record.' Smelcher v. State, 520 So.2d 229 (Ala.Cr.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Cr.App.1986). "Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done." Jolly v. State, 405 So.2d 76 (Ala.Cr.App. 1981); Watson v. State, 398 So.2d 320 (Ala. Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).'" Gaddy v. State, 698 So.2d at 1130, quoting Owens v. State, 597 So.2d 734, 736 (Ala.Cr.App.1992).

XXIV
The appellant argues that the trial court erred in allowing him to argue to the jury in favor of a death sentence without ensuring that his decision to do so was knowing and voluntary. This argument is being raised by *1088 the appellant for the first time on this appeal; therefore, it must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The record indicates that the appellant's decision to argue in favor of the death penalty was a well thought-out and well reasoned tactical decision based on his vast experience with the criminal justice system. The appellant indicated to the trial court before trial that he intended to argue in favor of the death penalty if the jury convicted him. The appellant took an active and effective role in the development and presentation of his defense. In a pretrial letter to the trial judge, the appellant stated that, if he was found guilty, he would ask for the death penalty; he said that he had no death wish, but it was "a simple matter of fact" that convicts receiving death sentences got automatic, faster, and "more intense scrutinizing," which he was confident would lead to a new trial. He further acknowledged that "death row is just a better place to do hard time in prison," and that he would have better access to the law library as a death row inmate. Thereafter, during voir dire questioning, the appellant asked the trial court if he could inform the veniremembers that he planned to request the death penalty if he was found guilty. The trial court denied this request. Following the jury's return of a verdict of guilt, the appellant asked the trial court if he could forego the presentation of any mitigating evidence, and reminded the judge of his "position" concerning his desire to receive the death sentence. The following transpired concerning this request:
"MR. ARTHUR: I would like to ask if there is any way to avoid the mitigating circumstances. You know what my position is.
"THE COURT: That's right.
"You owe us a response, sir, on waiver of jury trial, if you want
"[PROSECUTOR]: I can't do that.
"THE COURT: Just not agree to that.
"MR. ARTHUR: So, that would include reading the mitigating circumstances, too, then?
"THE COURT: I am going to do that. I am not going to treat this subject capriciously, I assure you.
"MR. ARTHUR: I understand. But you know what result I want, and you know why I want it.
"THE COURT: You want to tell the jury that? Let's hope that you do not want to tell the jury that, Mr. Arthur.
"MR. ARTHUR: I have been right twice, Judge, and I believe I'm still right. I want to stay with that. Death row is the best place for me to fight it from, and I wantI sincerely do, I really do.
"THE COURT: I cannot keep you from testifying to the jury. I don't propose to do that. But I do say to you that this matter will not be handled in a whimsical fashion.
"MR. ARTHUR: I understand. What I was trying to do is just expedite it.
"THE COURT: [Prosecutor] says no. He wants the jury involved.
"MR. ARTHUR: Okay.
"THE COURT: Can you take a minute to compose what remarks you want to make to the jurydo you want to address the jury or do you want to testify from the stand or what? You don't have to testify.
"MR. ARTHUR: No, sir. I would just like to read these things that I can't remember, but I have them wrote down.
"THE COURT: You are welcome to do that, but I want to give you a moment to reflect upon the perilous journey that you are about to embark upon.
"MR. ARTHUR: I have been on it for ten years, and believe me, I don't like it, Your Honor. But I believe it's my best position to fight from."
Thereafter, defense counsel asked the trial court for time to consult with the appellant. The trial court granted this request. Following that conference, defense counsel made the following remarks concerning the appellant's decision to seek the death penalty:
"[Defense counsel]: Your Honor, at this time I would like to make a statement before the jury is brought back for the aggravating and mitigating procedure. I would like to make known to the court the following facts: I have consulted with the defendant; it is his intent to address the *1089 jury at the appropriate time and ask that they sentence him to death by electrocution.
"I have strongly disagreed with him on that position. He has asked me to not argue to the jury for anything less than the death penalty. And he has ... instructed me not to do so.
"It is my intent at this time to proceed... and introduce into evidence mitigating circumstances and argue to the jury for a penalty less than the death penalty, which would be contrary to the instructions of my client.
"THE COURT: All right, sir.
"[Defense counsel]: Mr. Arthur, is that a true statement?
"MR. ARTHUR: Yes, sir, that's true. I have asked you not to do what you are fixing to do.
"THE COURT: All right. Thank you.
"[Defense counsel]: In that case, Your Honor, we are ready.
"THE COURT: Okay."
Following this statement by the defense counsel, exhibits were marked for identification, and the appellant made the following statement to the trial court:
"MR. ARTHUR: For information, I spoke it on the record, I don't know, I was wondering if I can convince these people to recommend the death sentence, will you please go along with it and give it to me tonight? Let's don't go through a long time waiting to be sentenced where I can get on back to my cell at Holman.
"I have an empty cell at Holman, and I can get to work on my appeal. The pre-sentence report will be just a waste of your time and the taxpayers' moneythere ain't no pre-sentence report, I have been in the penitentiary for 15 years.
"THE COURT: Let's cross that bridge when we get there.
"MR. ARTHUR: Okay. I am just trying to get on home.
"THE COURT: I understand."
The appellant then presented his argument to the jury, requesting that it recommended a death sentence. He set forth all his reasons for asking the jury to do so: that he needed access to the death row library at Holman Prison; that he did not want to die and was positive he would not be executed, but that he believed he could better fight his conviction from death row; that death row inmates have more visitation time; that a death row sentence would result in an automatic appeal with heightened scrutiny; that he had asked for a death sentence in each of his prior trials and had been sentenced to death each time, and each case ended in a reversal on appeal; and that his jail cell at Holman Prison had become like home to him. The jury then granted the appellant's request by returning an advisory verdict of death. The appellant then advanced his argument to the trial court again through a letter and subsequently at the final sentencing hearing.
Following a conviction for capital murder, a defendant may be legally sentenced to life imprisonment without parole or the death penalty. Matters of trial tactics and trial strategy are rarely interfered with or second-guessed on appeal, unless the advocate abrogates his duty as an effective counsel. Cf. State v. Bacon, 337 N.C. 66, 446 S.E.2d 542 (1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1120, 130 L.Ed.2d 1083 (1995) (defendant's counsel in capital resentencing proceeding following appellant's reversal of first sentencing proceeding not ineffective because defense counsel informed jury that defendant had received death sentence in first proceeding; statement was part of counsel's trial tactic to explain absence of defendant's mother from courtroom). People v. Davis, 849 P.2d 857 (Colo.App.1992), aff'd, 871 P.2d 769 (Colo.1994) (defense counsel not ineffective for failing to attack prior convictions of capital murder defendant, based on tactical decision to argue to jury that defendant could receive two life sentences and that, thus, society would be protected even if defendant was not sentenced to death). People v. Bone, 154 Ill.App.3d 412, 107 Ill.Dec. 142, 506 N.E.2d 1033 (1987) (Illinois Court of Appeals held that defense counsel should be allowed in certain circumstances to argue to the jury that his client was guilty in hopes of receiving a more lenient sentence).
*1090 Similarly, in Floyd v. State, 571 So.2d 1221, 1228 (Ala.Cr.App.1989), reversed on other grounds, 571 So.2d 1234 (Ala.1990), the defendant argued that his trial counsel was ineffective for advising him to waive a punishment stage jury; however, this court held that the decision was a reasonable strategic one.
"Based on the circumstances, Floyd's attorney was not ineffective in advising his client to waive a punishment-stage jury hearing, since this recommendation was made pursuant to his sentencing strategy; that is, to have Floyd testify against his co-defendants. This decision was not unreasonable where counsel had conducted an investigation seeking possible mitigating circumstances, but had found no mitigation that he thought would aid his client. Appellant's trial counsel basically seized an opportunity to create mitigation where none existed, and, thus, to increase his client's chances of avoiding the death sentence. Again, this strategic decision was sound, and on review it is virtually unchallengeable."
571 So.2d at 1228.
In the present case, the appellant clearly indicated that, based on his experience, he was making a knowing and intelligent trial strategy decision to seek the death penalty, and he gave reasonable grounds for this decision: his ultimate goal was avoiding the death penalty. In fact, the appellant argued for the death penalty in his previous trials, and his strategy proved effective both earlier convictions were ultimately reversed. There was no plain error on this ground.

XXV
The appellant argues that the trial court's order sentencing him to die was tainted by a number of errors.

A.
The appellant argues that the trial court failed to consider certain nonstatutory mitigating evidence concerning his good behavior in prison, his alcoholism, his positive employment record, and his deprived childhood. As previously noted, the appellant's strategy at sentencing was to seek the death penalty and to avoid the admission of any mitigating circumstances. The appellant did not object to the trial court's alleged failure to consider this mitigation at trial; therefore, this issue must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
At the sentencing hearing before the trial court, while the appellant personally requested that the trial court accept the jury's advisory verdict of death, the defense counsel argued as mitigation only that the appellant should not receive the death penalty when the other participants to the instant offense received lesser sentences or were not even prosecuted. The record reflects that the trial court specifically found and weighed this mitigating circumstance. The trial court clearly considered the presentence report and the defense counsel declined to offer any exhibits or testimony at this sentencing hearing before the trial court. In his sentencing order, the trial court referred to defense exhibits that had been offered during the sentencing hearing before the jury, "chiefly concerning defendant's exemplary conduct as a state prisoner."
In the trial court's order, he considered each statutory mitigating circumstance and found none to apply. As to the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, the trial court found that this statutory mitigating circumstance did not apply; however, he noted that Judy Wicker testified that she smelled alcohol on the appellant's breath the morning of the killing. The trial court did not find this evidence sufficient to "mitigate the defendant's culpability."
As to any nonstatutory mitigating circumstances, the trial court found in its sentencing order that such circumstances did exist. The trial court stated that "[t]he unquestioned culpability of Teresa Roland and Theron McKinney as accomplices to defendants Arthur and Judy Wicker according to the state's theory of the case and the state's inability to prosecute Roland and McKinney offer a basis of a sentence of life without parole instead of death."

*1091 "A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 71 L.Ed.2d 1, 102 S.Ct. 869 [874] (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 57 L.Ed.2d 973, 98 S.Ct. 2954 [2964-65] (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 93 L.Ed.2d 934, 107 S.Ct. 837 (1987); Ex parte Henderson, 616 So.2d 348 (Ala. 1992); Haney v. State, 603 So.2d 368 (Ala. Cr.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297 [122 L.Ed.2d 687] (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207 [127 L.Ed.2d 554] (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 88 L.Ed.2d 276, 106 S.Ct. 269 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed non-statutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1986), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 95 L.Ed.2d 207, 107 S.Ct. 1634 (1987). Thus, the trial court's failure to list and to make findings in its sentencing order as to all of the alleged non-statutory mitigating circumstances offered by the appellant indicates only that it found the evidence not mentioned to be not mitigating, not that the evidence was not considered."
Bush v. State, supra, at 89.
Similarly, in the present case, the trial court did not need to list that it considered the appellant's good behavior in prison, his alcoholism, his positive employment record, or his deprived childhood, and did not find that there were mitigating circumstances. A review of the record indicates that such a finding by the trial court was correct. "[I]t is clear that the trial court understood its duty to consider all the statutory and nonstatutory mitigating circumstances." Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995).

B.
The appellant also argues that the trial court improperly considered the desire of the victim's family for the appellant to receive the death penalty. Specifically, the appellant refers to two excerpts from the 1987 presentence report, which was attached to the 1992 presentence report and made reference to information concerning the appellant's arrest record before the instant offense and to information about the appellant's personal and social histories, as this information had previously been collected and summarized. The statements to which the appellant refers was one indicating that the victim's family was very upset over his death and another wherein the probation officer stated that a member of the victim's family told him that the family believed that the appellant should be sentenced to death. The appellant failed to object to this matter at any time prior to this appeal; therefore, any error would have to be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The appellant argues that these two statements in the presentence investigative report constitute "victim impact statements" and their consideration by the trial court constituted reversible error in violation of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the Alabama Supreme Court addressed a case wherein the appellant argued that the trial court had improperly considered victim impact statements made by the victim's husband that were included in the presentence investigation report, including the husband's statements concerning the ways in which his wife's murder *1092 had affected him and his family. There were further statements concerning his opinions about the crime, about the defendant, and about the appropriateness of the death sentence in that case. The Alabama Supreme Court noted that these statements consisted of three paragraphs that comprised 2 pages of a 37-page report. Moreover, there was no indication in the trial court's sentencing order that it had considered the victim's husband's statement in sentencing the victim, or that it had based the appellant's sentence, even in part, on that statement. In Ex parte Rieber, 663 So.2d at 1006-07, the Alabama Supreme Court applied the law concerning victim impact statements received during sentencing to the facts of that case, which we find are similar to the facts in this case, and stated as follows:
"In Ex parte Martin, 548 So.2d 496, 497-98 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), this Court wrote:
"`Martin next contends that the introduction of victim impact information at the sentencing phase of the trial violated the Eighth and Fourteenth Amendments to the United States Constitution.
"`After the jury had rendered its advisory verdict in the sentencing phase of the trial, but before the trial court had pronounced sentence, a "presentence report" was filed by the Alabama Board of Pardons and Paroles. That report contained the following statement, which, Martin contends, violates the Eighth and Fourteenth Amendments:
"`"It is the belief of this officer that this offense has had a significant impact on the lifestyle of [the victim's wife]. She is now a single parent whose son has lost his father. She reports that her life has changed socially, emotionally, and that she is very paranoid, often nervous and very easily upset."
"`In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court held that the introduction at the sentencing phase of a capital murder trial in state court of a victim impact statement, describing the effect of the crime on the victim's family, violates the Eighth Amendment. This case, however, differs from Booth.

"`In Booth, the victim impact statement was submitted to the jury for its consideration. In the present case, the presentence report was not presented to the jury, but was presented to the court. We also note that the victim impact information comprises only three sentences in a 36-page report that contains, among other things, details of the offense, mitigating and aggravating circumstances, Martin's criminal record, and Martin's personal history. We hold that the introduction of the presentence report containing the above statement was not error.'
"(Emphasis in original.) See also, Haney v. State, 603 So.2d 368 (Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala.1991), cert. denied, 507 U.S. 925, 113 S.Ct. 1297 [122 L.Ed.2d 687] (1993); and Pierce v. State, 586 So.2d 1005 (Ala.Crim.App.1991), wherein the Court of Criminal Appeals remanded for new sentencing hearings. In Haney, the Court was faced with a `substantial' victim impact statement that was `"carefully read, studied and considered"` by the trial court `"before arriving at the final decision determining the sentence.'" 603 So.2d at 382, quoting the trial court's sentencing order. In Pierce, there was no specific indication that the trial court had considered the victim impact statement contained in the presentence investigation report. Although in Haney and Pierce the Court of Criminal Appeals chose to remand for new sentencing hearings, out of `an abundance of caution,' a remand is not required in every death penalty case in which a victim impact statement appears in a presentence investigation report. Ex parte Martin, supra. We note that Mr. Craig's statements with respect to the murder's impact on him and his family were properly before the trial court during the sentencing phase. See Payne v. Tennessee, supra, partially overruling Booth v. Maryland, 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440] (1987), and South Carolina v. Gathers, 490 U.S. 805 [109 S.Ct. 2207, 104 L.Ed.2d 876] *1093 (1989). However, the Payne court did not overrule the rule stated in Booth prohibiting consideration of a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence during the sentencing phase of a capital murder trial. See 501 U.S. at 830, n. 2 [111 S.Ct. at 2611, n. 2]. In any event, we conclude, based on the record before us (indicating that Mr. Craig's statements about the crime, about Rieber, and about the appropriateness of a death sentence, comprised only a portion of the three paragraphs in the victim impact statement), that the rule stated in Ex parte Martin controls this case."
Based on the facts and circumstances of the instant offense and pursuant to the Alabama Supreme Court's holding in Ex parte Rieber, supra, there is no indication of plain error on this ground.

C.
The appellant argues that the trial court was erroneously presented with information concerning unadjudicated crimes and nonstatutory aggravating conduct allegedly committed by the appellant. Specifically, the appellant now objects to language contained in the 1987 presentence report, including information relating to felony arrests, and the statement of one of the appellant's acquaintances referring to him as a "con-artist." The appellant has never objected to the inclusion of these items before the instant appeal. Thus, the plain error rule applies. Rules 45A, Ala.R.App.P.
The trial court clearly stated in its order that it found the existence of only one aggravating circumstance that the appellant was under a sentence of imprisonment when he committed the instant murder. Moreover, the trial court had charged the jury that it could only consider that aggravating circumstance. There is no evidence that the trial court considered any nonstatutory aggravating evidence. The record indicates that the presentence investigative report was properly prepared and filed pursuant to § 13A-5-5 and § 13A-5-47(b), Code of Alabama 1975, and Rule 26.3, Ala.R.Crim.P. The confrontation regarding the arrest was not considered by the trial court as to a finding of whether the statutory mitigating circumstance that a defendant has no significant history of prior criminal activity exists. § 13A-5-51(1), Code of Alabama 1975. The trial court found that this mitigating circumstance did not exist, based on the prior murder conviction.
This same claim was raised in Bush v. State, supra, wherein the appellant argued that the trial court considered nonstatutory aggravating evidence included in the presentence report, concerning his juvenile record, which he argued was neither a conviction nor criminal in nature. This court affirmed the law in Alabama that a trial court may consider only the aggravating circumstances listed in § 13A-5-49, Code of Alabama 1975, in fixing the death penalty. As to the appellant's claim, this court stated:
"There is nothing in the record or in the sentencing order from which one could even infer that the trial court considered the appellant's juvenile record, as shown in the pre-sentence report, as non-statutory aggravating evidence. We, thus, find no merit to the appellant's contention. In the absence of some evidence to the contrary, we must presume that the trial court knew the law and that it correctly applied it in making its decision. Walton v. Arizona, 497 U.S. 639, 111 L.Ed.2d 511, 110 S.Ct. 3047 (1990); Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994)."
Bush v. State, supra, at 92. There being no indication in the record that the trial court considered improper nonstatutory aggravating evidence, there was no plain error on this ground.

D.
The appellant argues that the sentencing order does not show that the trial court found that the aggravating circumstance outweighed the mitigating ones. The appellant argues that the order failed to reflect that the trial court independently weighed the aggravating and mitigating circumstances; rather he argues that the trial court imposed the death sentence based on the presumption that the jury's advisory verdict of death was correct. The appellant failed to object on *1094 this ground at trial and, therefore, it is reviewable only as plain error. Rule 45A, Ala. R.App.P.
The appellant quotes the trial court's language in its sentencing order: "In conclusion, the court finds that the aggravating circumstance noted above weighed against the mitigating circumstance noted above compels the court to uphold the jury's advisory verdict affixing punishment at death." However, a review of the trial court's order and the record clearly indicates that the trial court conducted an independent weighing of the aggravating and mitigating circumstances.
"It is clear from the record, including all of the jury instructions and sentencing order, that the trial court clearly understood the law and did not believe that a death sentence was mandatory. Furthermore, we do not agree with the appellant's reading of the sentencing order."
Dill v. State, 600 So.2d 343, 364 (Ala.Cr.App. 1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, Dill v. Alabama, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (wherein the appellant had argued that the trial court erred in its sentencing order in stating that "the court holds that the aggravating circumstances outweigh the mitigating circumstances and compel the court to affix punishment at death").

XXVI
The appellant argues that the prosecutor made a number of improper and highly prejudicial comments in his closing argument at the sentencing hearing. The appellant cites to three such instances.

A.
The appellant argues that the prosecutor urged the jurors to treat mitigating evidence of his good behavior in prison as aggravating evidence, by arguing to the jury that it should consider defense exhibits indicating that the appellant had exhibited good behavior in prison, but that the exhibits were an example of the appellant's tendency to "con" and use people. The appellant did not object to this comment at trial and, although this alleged error must be analyzed pursuant to the plain error rule, his failure to object weighs against any claim of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Moreover, the record indicates that, in his attempt to avoid the introduction of any mitigating evidence in hope of receiving the death penalty, the appellant argued to the jury in his closing argument that these exhibits related to a much earlier time when he was "trying to get minimum custody to go to work release." Therefore, the prosecutor's remark was a proper comment on the evidence and the inference to be drawn from the evidence. "Whatever is in evidence is considered subject to legitimate comment by counsel. The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." Stewart v. State, 601 So.2d 491, 506 (Ala.Cr.App. 1992).
In Bankhead v. State, 585 So.2d 97, 107 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), the defendant argued that the State had urged that the nonexistence of any statutory mitigating circumstances, which he had determined by going down the list of statutory mitigating/mitigating circumstances and concluding that none applied, should be weighed as aggravating circumstances. This court concluded that the State's argument was not that the lack of mitigation should be weighed as aggravation, but rather, that there was simply no mitigating evidence. As such, the argument was proper. See also Rutledge v. State, 523 So.2d 1087, 1097 (Ala.Cr.App. 1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988) ("the prosecutor did not argue that the lack of evidence of statutory mitigation should be considered by the jury as an aggravating circumstance.... It appears that the argument was simply a way of leading into a discussion of the facts in evidence and reasonable inferences to be drawn therefrom").

*1095 B.
The appellant further argues that the prosecutor made improper and prejudicial comments to the jury, in stating that the jury should not show mercy for Arthur.
"[I]n California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court decided that `an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.' 479 U.S. at 539, 107 S.Ct. [at] 838."
Kuenzel v. State, supra, at 496.
The prosecutor's remarks were neither incorrect statements of law, and they did not render the trial court fundamentally unfair. Jenkins v. State, 627 So.2d 1034, 1051 (Ala.Cr.App.1992), affirmed, 627 So.2d 1054 (Ala.1993) (prosecutor's comments to the jury did not incorrectly urge them not to use their sympathy in their decisionmaking). Moreover, this comment by the prosecutor was not an attempt to treat the appellant's lack of mercy for the victim as a nonstatutory aggravating circumstance. See Johnson v. State, 620 So.2d 679 (Ala.Cr.App. 1993), reversed on other grounds, 620 So.2d 709 (Ala.1993) ("The prosecutor was not suggesting that the lack of remorse [by the appellant] was an aggravating circumstance.")

C.
The appellant argues that the prosecutor improperly directed the jurors to ignore mitigating evidence concerning the more lenient treatment received by the appellant's accomplices in the judicial system. The record indicates that defense counsel had argued that the disparity in treatment between the appellant and the accomplices constituted a nonstatutory mitigating circumstance. The trial court in its sentencing order found the same. In his closing argument to the jury at the sentencing hearing, the prosecutor referred to the fact that the accomplices were not on trial in the present case, but rather to consider the evidence concerning the appellant. The prosecutor stated, "Like I said, please don't decide the case based on what Mr. Arthur has argued to you. Base it on what you are suppose to base it on, the weighing process that's given to you by the Court."
Similarly, in Bankhead v. State, 585 So.2d at 108, the appellant had argued that the prosecutor had improperly suggested to the jury that intoxication was not a mitigating circumstance and should not be considered as such. The appellant argued that this argument was improper because the sentencing authority can not be precluded from considering as mitigation any aspect of a defendant's character or record, or any of the circumstances of the offense. In holding that the prosecutor's comments did not violate this rule, this court held:
"First, the prosecutor did not argue that intoxication should not be a mitigating circumstance at all. He simply argued that it should not support a finding of a particular mitigating circumstance§ 13A-5-51(2). Any aspect of the crime may be considered as mitigation under § 13A-5-52, Code of Alabama 1975, and the prosecutor did not argue to the contrary. Indeed, the above-excerpted portion of the prosecutor's remarks supports this finding. Second, in any event, the prosecutor's argument did not preclude the jury's consideration of intoxication as a mitigating circumstance. At most, he argued that the jury should find that intoxication was not a mitigating circumstance. While Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)], and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."
In the present case, there was no impropriety in the prosecutor's argument that the jury should not return a verdict of life imprisonment without parole based on this nonstatutory mitigating circumstance. "At the sentencing hearing, following the presentation of evidence of aggravating and mitigating circumstances, the prosecutor and defense counsel shall be given an opportunity to argue for and against respectively the imposition of the death penalty in the individual *1096 case." Beck v. State, 396 So.2d 645, 663 (Ala.1981). The prosecutor was merely arguing for the imposition of the death penalty.

XXVII
The appellant argues that the trial court instructed the jurors on inapplicable mitigating circumstances, thereby inviting the jurors to treat the absence of the mitigating circumstances from the appellant's case as aggravating. However, the record indicates that defense counsel requested the trial court to read all of the statutory mitigating circumstances to the jury. Thus, the appellant invited any error and, because of the absence of any objection by the appellant, any error would have to be analyzed pursuant to the plain error rule. Rule 45A, Ala. R.App.P.
Furthermore, this court has held that "[t]he trial court's reading of the entire list of statutory mitigating factors was proper. See McWilliams v. State, 640 So.2d 982 (Ala.Cr.App.1991). As a practical matter, it would be impossible to determine the existence of any statutory mitigating factors unless it had been instructed on what those factors were." Carroll v. State, 599 So.2d 1253, 1271 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).

XXVIII
As required by § 13A-5-53, Code of Alabama 1975, we address the propriety of the appellant's conviction and sentence of death. The appellant was indicted and convicted of capital murder in violation of § 13A-5-40(a)(13), Code of Alabama 1975, for intentionally causing the death of Troy Wicker by shooting him with a pistol after having been convicted of murder in the second degree in 1977 in the Circuit Court of Marion County.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Code of Alabama 1975.
A review of the record shows that the trial court correctly found the existence of one aggravating circumstance: that the capital offense was committed by a person under sentence of imprisonment. The trial court correctly found the existence of no statutory mitigating circumstance; however, it properly found the existence of the nonstatutory mitigating circumstance concerning the disparity of treatment between the appellant and his accomplices. The court weighed the mitigating and aggravating circumstances and properly determined that the aggravating circumstance outweighed the nonstatutory mitigating circumstance. We agree.
As required by § 13A-5-53(b)(2), Code of Alabama 1975, this court must independently weigh the aggravating and mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing, this court is convinced that the appellant's sentence of death is the appropriate sentence.
Section 13A-5-53(b)(3), Code of Alabama 1975, requires that we also address whether the appellant's sentence was disproportionate or excessive when compared to penalties imposed in similar cases. The appellant's sentence was neither. For other cases involving capital murder within 20 years following the conviction of another murder, see e.g. Carroll v. State, supra; Nelson v. State, 511 So.2d 225 (Ala.Cr.App.1986), affirmed, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Hubbard v. State, 500 So.2d 1204 (Ala.Cr.App.1986), affirmed, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987).[6] Moreover, the fact that two of the appellant's accomplices were not prosecuted does not make his death sentence disproportionate. See Neelley v. State, 494 So.2d 669, 682 (Ala.Cr.App.1985), affirmed, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987). Similarly, although Judy Wicker, an accomplice, received *1097 a life sentence while Arthur received a death sentence, there was no disparity, especially because the appellant was the triggerman and was already serving a life sentence for murdering a family member when he killed the victim. See Wright v. State, 494 So.2d 726, 740-41 (Ala.Cr.App.1985), affirmed, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The appellant received a fair trial. Therefore, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
All judges concur.
NOTES
[1] Reference should be made to this court's earlier rendition of the facts found at Arthur v. State, 575 So.2d at 1167-70, for an overall picture of the evolution of this case. This court may properly take judicial notice of its own records, Riddle v. State, 669 So.2d 1014 (Ala.Cr.App. 1994); Ray v. State, 646 So.2d 161, 161 n. 1 (Ala.Cr.App. 1994).
[2] Apparently his possession of this money was unauthorized under work release rules and regulations.
[3] It should be noted that the record indicates that the appellant did not actually move for continuance. In brief, the appellant seems to argue that he made this motion impliedly because he stated to the trial court during his lengthy explanation that the investigator did not become involved until early November and did not have time to adequately investigate prior to the December 2, 1992, trial date. However, soon after this discussion, the trial court asked the appellant what he was asking the trial court to do and the appellant responded that he wanted the remaining attorney to represent him and for the appellant to be allowed to act as co-counsel.
[4] Although the appellant alludes in his brief to the court to a document entitled "Motion To Dismiss Indictment Due To The State's Inadequate Assistance To Appointed Counsel," contained in the record, the document is not signed by the attorney and the certificate of service is not completed, indicating that it was never filed.
[5] Presumably the appellant erroneously stated Cullman County when he meant Colbert County.
[6] The latter two cases were governed by the former statute, § 13-11-2(a)(13), Code of Alabama 1975.